993 A.2d 1190

**MBC REALTY, LLC, et al.**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE, et al.**

**No. 2601 Sept.Term, 2008.**

Court of Special Appeals of Maryland.

May 5, 2010.

222

M. Albert Figinski (Jeffrey J. Utermohle and Joshua L. Caplan, on the brief), Baltimore, MD, for Appellants.

Herbert Better (P. Andrew Torrez, George A. Nilson, City Sol., Sandra R. Gutman, City Sol., and Adam S. Levine, Asst. City Sol., on the brief), Baltimore, MD, for Appellees.

DEBORAH S. EYLER, KEHOE and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

In 2000, the Mayor and City Council of Baltimore ("the City") enacted an ordinance imposing a moratorium on new billboards ("the Billboard Moratorium"). This appeal concerns three ordinances subsequently enacted that together 1) created an exception to the Billboard Moratorium, as a conditional use, for publicly-owned stadia and arenas in the B–5 zoning district; and 2) approved as a conditional use the erection of 14 billboards on the First Mariner Arena ("the Arena"), which is located in that district.[1]

The Arena is owned by the City. Its primary tenant is First Mariner Bancorp, whose Chief Executive Officer, Edwin F. Hale, Sr., owns the Baltimore Blast, a professional indoor soccer team. The Blast plays its home games at the Arena.

The three ordinances were challenged in the Circuit Court for Baltimore City by various opponents who own or have interests in properties in the vicinity of the Arena. The better part of the next five years was spent in court proceedings, including an appeal in this Court and then in the Court of Appeals, over the proper procedural means to challenge the ordinances. *See MBC Realty, LLC v. Mayor & City Council of Baltimore*, 403 Md. 216, 941 A.2d 1052 (2008), *aff'ing in part and rev'ing in part*, 160 Md.App. 376, 864 A.2d 218 (2004).

Ultimately, the Court of Appeals held that a declaratory judgment action, under Md.Code (2006 Repl.Vol.), sections 3–401 through 3–415 of the Courts and Judicial Proceedings

---

1. Under Maryland zoning law, a conditional use and a special exception are "largely synonymous." *Md. Overpak Corp. v. Mayor & City Council of Balt.*, 395 Md. 16, 29 n. 12, 909 A.2d 235 (2006).

Article, was the proper legal vehicle to challenge the ordinance that created the conditional use as an exception to the Billboard Moratorium; and an administrative appeal, under Md. Code (2003 Repl.Vol.), article 66B, section 2.09(a)(ii), by way of an action for judicial review, under title 7, chapter 200 of the Maryland Rules, was the proper legal vehicle to challenge the ordinance that granted the conditional use to the City, for the Arena. The case was remanded to the circuit court, which, after further proceedings, issued two judgments: one declaring the ordinance creating the conditional use exception valid and one upholding the City Council's grant of the conditional use to the City, for the Arena.

This appeal is taken from those judgments. The appellants before this Court are the parties who challenged the ordinances below.[2] The appellees are the City and the private companies that manage the arena by contract with the City, Arena Ventures, LLC, and SMG, Inc. We have reworded and separated the questions presented by the appellants as follows:

I. Did the circuit court err by declaring legal the ordinance that created a conditional use for publicly-owned stadia and arenas in the B–5 zoning district?

II. Was there substantial evidence to support the City Council's decision to grant the conditional use in question to the City, as owner of the Arena, and was that decision in accordance with the law?

III. On remand, did the circuit court err "in challenging [the appellants'] standing to challenge" the ordinance granting the conditional use to the City as the owner of the Arena?[3]

---

**2.** They are MBC Realty, Inc.; Banc of America Community Development Corp.; Charles Plaza LLC; Charlesview LLLP; Park Charles Apartments Assoc. LLC; Park Charles Office Associates LLC; PGA One Charles Center Limited Partnership; PGA 210 North Charles Street LLLP; Redwood Square Apartments Limited Partnership; The Atrium at Market Square LLC; The Marlboro–Classic Limited Partnership; and 120 West Fayette Street LLLP.

**3.** The questions presented, as worded by the appellants, are:

For the reasons that follow, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

On March 27, 2000, the City enacted Ordinance 00–0001, a text amendment to several sections of the Baltimore City Zoning Code ("Zoning Code" or "Zg"), which had the effect of prohibiting all new billboards in the City.[4]

Before the Billboard Moratorium was enacted, new billboards had been allowed as conditional uses in some zoning districts, including the B–5 district. The B–5 district is the "Central Commercial District," which is covered by Title 6, Subtitle 6 of the Zoning Code.

A year after the Billboard Moratorium was enacted, the City Council passed and the Mayor approved Ordinance 01–230, which carved out an exception for general advertising signs at bus shelters. That ordinance amended the definition of "general advertising sign" in the Zoning Code to exclude "a sign that: (I) is attached to a bus passenger shelter; and (II)

---

1. Whether Baltimore City, after enacting, as CC–00–0001, in 2000, a total ban on new billboards, a/k/a general advertising sign structures, crafted a specially contrived exception in the form of a package of three ordinances (CC–03–513, CC–03–514, and CC–03,515) which give special favor to the lessee of the Baltimore Arena in derogation of land use and zoning principles, particularly, (a) piecemeal zoning, (b) spot zoning, and (c) contract or conditional zoning.
2. On remand from the Court of Appeals, did the circuit Court err in challenging Appellants' standing to challenge CC–03–515?

4. Within the language of the Zoning Code, a billboard is a "general advertising sign," which is defined as "any billboard, posterboard, or other sign that directs attention to a business, commodity, service, event, or other activity that is: (I) sold, offered or conducted somewhere other than on the premises on which the sign is located or to which it is affixed; and (II) sold, offered, or conducted on the premises only incidentally if at all." Zg § 11–101(e)(1). Prior to the enactments at issue in this case, the general prohibition imposed by the Billboard Moratorium appearing at section 11–206 of the Zoning Code stated: "The erection, placement, or construction of new general advertising signs (billboards and poster boards) is prohibited, and the City may not issue permits for these signs."

complies fully with the requirements of § 11–424 of this title." Section 11–424 of the Zoning Code imposed specific limitations on the design, size, and content of advertising signs on bus shelters and specified the procedure for obtaining approval to erect signs of that sort.

Almost three years after the Billboard Moratorium was enacted, on September 23, 2002, three bills were introduced before the City Council that, if enacted, together would allow a second exception to the moratorium. The bills would create a conditional use for new billboards on publicly owned stadia and arenas in the B–5 zoning district and grant such a conditional use to the City, as owner of the Arena. The bills proposed the following Ordinances: 1) 03–513, amending the text of the Urban Renewal Plan for the Market Center Area of Baltimore City (in which the Arena is located) to allow new billboards approved by ordinance as a conditional use on publicly owned stadia and arenas; 2) 03–514, amending the text of the Zoning Code to create for the B–5 district a conditional use for new billboards on publicly owned stadia and arenas; and 3) 03–515, granting such a conditional use to the City for 14 new billboards on the exterior of the Arena.

The applicant for the bills was listed as the "Administration (Baltimore Development Corporation)." [5] At the time, the only publicly owned stadia and arenas in the B–5 zone were the Arena, Oriole Park at Camden Yards, and the M & T Bank Stadium. "The latter two are owned by the State of Maryland and thus are not subject to zoning regulations by Baltimore City. *See Mayor & City Council of Balt. v. State,* 281 Md. 217, 223–24, 378 A.2d 1326, 1329–30 (1977)." *MBC,* 403 Md. at 223 n. 7, 941 A.2d 1052. Thus, when the legislation was proposed, the Arena was the only property that not only was eligible for such a conditional use but also would have any need to apply for it.

---

5. In its *MBC* opinion, the Court of Appeals said: "In *City of Baltimore Development Corporation v. Carmel Realty Associates,* 395 Md. 299, 336, 910 A.2d 406, 428 (2006), we described the Baltimore Development Corporation as a public body and an instrumentality of the municipal government of Baltimore City." 403 Md. at 220 n. 2, 941 A.2d 1052.

The bills were referred to the City Planning Commission, Department of Planning ("Commission"). Its staff prepared a report ("Staff Report") describing the bills and recommending their approval. The Staff Report identified Hale as a petitioner for the bills and as an applicant for the conditional use. The report further recommended, at the suggestion of the Citizens Planning and Housing Association ("CPHA"), an established grass roots advocacy group that had championed enactment of the Billboard Moratorium, that, if the conditional use were granted so that the new signs would be allowed on the exterior of the Arena, the City also would require that an equal number of existing billboards in the City be removed.

On January 9, 2003, the Commission considered the bills and, with certain amendments not relevant here, recommended that the City Council pass them. On February 19, 2003, hearings on the bills were held before the Land Use and Planning Committee of the City Council. The bills were amended to require, as lobbied by CPHA, that for each new billboard the Arena would be permitted to erect, one billboard elsewhere in Baltimore City would be removed.

On March 24, 2003, the City Council passed Ordinance 03–513, which took effect immediately, and Ordinance 03–514, which took effect 30 days later. Then, on April 7, 2003, it passed Ordinance 03–515, which took effect 30 days after that. The Mayor signed the three ordinances into law on April 9, 2003.[6]

---

6. Ordinance 03–514 is codified at Zg sections 6–609, 11–206, and 14–349. Zg section 6–609, which governs the B–5 district, was amended to add as a conditional use requiring approval by ordinance: "General advertising signs erected or placed on publicly-owned stadiums and arenas." Zg section 11–206 was amended to provide that, "[e]xcept as otherwise specifically authorized in this article," new general advertising signs are prohibited and the City may not issue permits for them. Finally, Zg section 14–349 was amended to read:

All bills introduced to approve a conditional use for 1 or more general advertising signs to be erected or placed on a publicly-owned stadium or arena must be accompanied by a plan for the removal elsewhere of at least 1 existing general advertising sign for each new general advertising sign to be placed or erected under the conditional use.

As mentioned above, there followed actions for judicial review in the Circuit Court for Baltimore City and appeals, all of which concerned, as the Court of Appeals put it, the "modalities of legal process [that] may be available to obtain judicial scrutiny of these enactments by the Mayor and City Council." *MBC*, 403 Md. at 219, 941 A.2d 1052. Those thorny procedural issues were put to rest when the Court held that

[the appellants] must pursue via their declaratory/injunctive action their grievances with regard to Ordinance 03–514, the zoning ordinance text amendment to the Baltimore City Zoning Article, but should be allowed to amend that action to frame in a petition for judicial review their claims as to Ordinance 03–515 granting the specific conditional use to the Arena.

*Id.* at 242, 941 A.2d 1052. The Court referenced only Ordinances 03–514 and 03–515 because, as it had noted elsewhere in its opinion, by then, the appellants were not seeking declaratory and injunctive relief respecting Ordinance 03–513, the text amendment to the Urban Renewal Plan, given that that ordinance would be ineffective or inconsequential if Ordinance 03–514 were found illegal. That remains the case, and therefore, for ease of discussion, in this opinion we shall focus only on Ordinances 03–514 and 03–515.

On remand, the appellants filed a second amended complaint refashioning their claims to comport with the holding of the Court of Appeals, *i.e.*, by including counts for declaratory and injunctive relief respecting Ordinance 03–514 and counts for judicial review respecting Ordinance 03–515.

The parties filed motions for summary judgment and oppositions on the declaratory judgment counts and submitted memoranda of law under Rule 7–207 with respect to the judicial review counts. The court held a hearing on all motions, and held the matter *sub curia*.

The court issued a declaratory judgment ruling legal the City's creation, by enactment of Ordinance 03–514, of the conditional use in question. It also issued an order in the action for judicial review upholding the City Council's decision

to grant the newly created conditional use to the City, as owner of the Arena property. The circuit court judge explained these rulings in an accompanying 32–page memorandum opinion.

This timely appeal followed.

## DISCUSSION

## I.

### *Ordinance 03–514 (Declaratory Judgment)*

The State's police power encompasses the power to regulate land use, including the power to plan and zone. For property within the City of Baltimore, the State has delegated planning and zoning power to the Mayor and City Council by article 66B, sections 2.01 through 2.13 of the Maryland Code (2003 Repl.Vol., 2009 Supp.). Section 2.02(a) empowers the City to divide the municipality into zoning districts and within them "regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land." In addition, by virtue of section 2.05(a)(1), the City is empowered to "periodically amend or repeal regulations, restrictions, and boundaries."

As Judge Harrell explained in *People's Counsel for Baltimore County v. Loyola College in Md.,* 406 Md. 54, 70, 956 A.2d 166 (2008), traditional "Euclidean" zoning, which divides a geographic area into use districts, is a " 'fairly static and rigid form of zoning.' " (quoting *Mayor & Council of Rockville v. Rylyns Enterprises, Inc.,* 372 Md. 514, 534, 814 A.2d 469 (2002)).[7] A conditional use or special exception is a zoning device that "introduces some flexibility to a 'fairly static and rigid' Euclidean zoning scheme . . . by serving as a 'middle

---

**7.** The term "Euclidean" comes from the seminal case of *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), which ruled constitutional a municipality's comprehensive zoning ordinance. *See People's Counsel for Baltimore Co. v. Loyola College in Maryland, supra,* 406 Md. at 70, 956 A.2d 166.

ground' between permitted uses and prohibited uses in a particular zone." *Id.* at 71, 956 A.2d 166.

A permitted use in a given zone is permitted as of right within the zone, without regard to any potential or actual adverse effect that the use will have on neighboring properties. A special exception, by contrast, is merely deemed *prima facie* compatible in a given zone. The special exception requires a case-by-case evaluation by an administrative zoning body or officer according to legislatively-defined standards. That case-by-case evaluation is what enables special exception uses to achieve some flexibility in an otherwise semi-rigid comprehensive legislative zoning scheme.

*Id.* at 71–72, 956 A.2d 166 (footnote omitted).

The leading Maryland case on special exceptions (and therefore on conditional uses), is *Schultz v. Pritts,* 291 Md. 1, 432 A.2d 1319 (1981), in which the Court described the zoning device as follows:

The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstances negating the presumption.* The duties given the Board are to judge whether the *neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

291 Md. at 11, 432 A.2d 1319 (emphasis in original).

As already noted, before the Billboard Moratorium was enacted for Baltimore City, some zoning districts allowed new billboards as a conditional use.[8] The ordinance effectuating

---

8. There were no residential use zoning districts among them. *MBC,* 403 Md. at 220, 941 A.2d 1052.

the moratorium was an amendment to the text of the Zoning Code that eliminated that conditional use in the districts in which it had been allowed and made the use a prohibited one in all districts. *See* Ordinance 00–0001 (amending Zg section 10.0–1 to prohibit the "erection, placement, or construction of new general advertising signs" and to prohibit the City from issuing permits for such signs). Thus, in 2000, by a legislative act that amended the text of the Zoning Code, new billboards no longer could be erected in the City. Enactment of the Billboard Moratorium did not involve any change in zoning classifications. The zoning districts in Baltimore City remained the same as they had been before the moratorium was enacted. Rather, by text amendment, the language of the Zoning Code was changed to prohibit erection of new billboards.

Like the law adopting the Billboard Moratorium itself, Ordinance 03–514 was a text amendment that did not change any zoning classification within the City. Before Ordinance 03–514 was enacted, the Arena property was located in the B–5 district; and it remained in that district thereafter. However, because it is a publicly-owned arena, its owner (the City) became eligible to seek a conditional use permit to erect new billboards on the property. As a text amendment to the Zoning Code, Ordinance 03–514 was a legislative act by the City Council, not a "zoning action" by the City Council subject to judicial review under article 66B section 2.09(a)(1)(ii). *MBC,* 403 Md. at 241–42, 941 A.2d 1052 (citing *Anderson House, LLC v. Mayor of Rockville,* 402 Md. 689, 939 A.2d 116 (2008); *Md. Overpak, supra,* 395 Md. 16, 909 A.2d 235). *Md. Overpak,* of course, was the basis for the Court of Appeals's decision in this case that the legality of Ordinance 03–514 is properly determined in a declaratory judgment action, not an administrative appeal/action for judicial review. *Id.* at 242, 941 A.2d 1052.[9]

---

9.  Judge Harrell pointed out in *MBC* that
    [s]ection 2.09(f) [of Article 66B] provides that "[i]n addition to the appeal provided in this section, the Mayor and City Council of

The appellants contend Ordinance 03–514 was illegally enacted, for several reasons. We shall address each reason in turn.

## (A)

### Comprehensive Rezoning/Presumption of Correctness of Legislative Action/Favoritism

■ "[T]he act of zoning either may be original or comprehensive (covering a large area and ordinarily initiated by local government) or piecemeal (covering individual parcels, lots, assemblages, and ordinarily initiated by the property owner)." *Mayor & Council of Rockville v. Rylyns Enterprises, Inc., supra,* 372 Md. 514, 814 A.2d 469. As Judge Harrell explained for the Court of Appeals in *Rylyns:*

> The requirements which must be met for an act of zoning to qualify as proper comprehensive zoning are that the legislative act of zoning must: 1) cover a substantial area; 2) be the product of careful study and consideration; 3) control and direct the use of land and development according to present and planned future conditions, consistent with the public interest; and 4) set forth and regulate all permitted land uses in all or substantially all of a given political subdivision, though it need not zone or rezone all of the land in the jurisdiction.

*Id.* at 535, 814 A.2d 469 (citations omitted).

■ There is a "strong presumption of correctness and validity" in favor of the "motives or wisdom of the legislative body in adopting original or comprehensive zoning." *Id.* (citation omitted). For that reason, the zoning established by original or comprehensive zoning only may be changed by subsequent comprehensive rezoning or, in the case of piece-

---

Baltimore may allow an appeal to the Circuit Court for Baltimore City of any matter arising under planning and zoning laws of the City of Baltimore." Baltimore City, however, has not availed itself of this opportunity to enact a broader appeal right than contemplated by § 2.09(a).

*MBC,* 403 Md. at 231 n. 10, 941 A.2d 1052.

meal rezoning, upon a showing that the original or comprehensive zoning was a mistake or that, since that zoning, there has been "a substantial change in the character of the neighborhood." *Id.* at 536–37, 814 A.2d 469.

In the case at bar, the appellants maintain that Ordinance 03–514 is invalid because it was not enacted by way of comprehensive zoning; and that, because it was not enacted by comprehensive zoning, it does not carry a presumption of validity. Instead, they argue, it was enacted outside the ordinary comprehensive zoning processes that are in place, in part, to eliminate favoritism in zoning changes and decisions. Therefore, the appellants continue, the circuit court should not have applied the presumption of correctness to the enactment of Ordinance 03–514 (especially in combination with Ordinance 03–515) in deciding, by declaratory judgment, the legality of the ordinance; and without the presumption, the ordinance should have been found illegal.

Our standard of review of a circuit court's ruling on a declaratory judgment action is governed by Rule 8–131(c). We review the court's factual findings for clear error and its legal findings *de novo*. *See, e.g.*, *Garfink v. Cloisters at Charles, Inc.*, 392 Md. 374, 383, 897 A.2d 206 (2006). In the case at bar, the material facts are not in dispute. Accordingly, our review is plenary.

As mentioned above, original zoning and comprehensive zoning happen when a community establishes, by legislation, zoning classifications for property within the area. *Rylyns, supra*, 372 Md. at 535, 814 A.2d 469. *See also Maryland–National Capital Park and Planning Commission v. Greater Baden–Aquasco Citizens Assoc.*, 412 Md. 73, 85, 985 A.2d 1160 (2009) (quoting *E.C. Yokley, Zoning Law and Practice*, § 5–2 (4th ed. 2003)). It results from extensive study of the community, or a substantial area within it, often over a period of years. *Greater Baden–Aquasco, supra*, 412 Md. at 85, 985 A.2d 1160. The product of original zoning (the first zoning enactment for a jurisdiction) or comprehensive zoning (a new or broadly revised zoning enactment for the jurisdiction) is a

detailed zoning map and regulation of uses. *Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 702, 376 A.2d 483 (1977). The original zoning for Baltimore City took place in 1923. *Rockville Fuel and Feed Co. v. City of Gaithersburg,* 266 Md. 117, 128, 291 A.2d 672 (1972). The last comprehensive zoning legislation for Baltimore City was enacted in 1971. *Armstrong v. Mayor and City Council of Baltimore,* 410 Md. 426, 447 & n. 27, 979 A.2d 98 (2009).

■ The appellants are incorrect in their assertion that, in order to add a new conditional use (or special exception) for a zoning district, the legislative body having zoning power— here, the Baltimore City Council—must engage in the comprehensive zoning process. A conditional use may be adopted by means of a text amendment, *i.e.,* a change to the language of the existing zoning ordinance. *MBC,* 403 Md. at 242, 941 A.2d 1052. As noted above, under article 66B, section 2.05(a)(1), the City is empowered to "periodically amend or repeal regulations, restrictions, and boundaries." The City points out that every conditional use that has been added to the Baltimore City Zoning Code since 1971 has been effectuated by means of a text amendment, not by means of the comprehensive zoning process.

■ In any event, the appellants' comprehensive zoning argument does not support their assertion that the enactment of Ordinance 03–314 was not entitled to a presumption of validity. Although passage of a text amendment is not original or comprehensive zoning, it has been held to be *in the nature of a legislative action. Md. Overpak,* 395 Md. at 35, 909 A.2d 235 (citing *Bd. of County Comm'rs of Carroll County v. Stephans,* 286 Md. 384, 390, 408 A.2d 1017 (1979)) (emphasis added). As such, it is treated as legislative action; and it is the legislative nature of a zoning enactment that gives rise to the presumption that it is valid. Therefore, the City Council's enactment of Ordinance 03–514 via text amendment was entitled to a presumption of validity, and the circuit court did not

err in applying that presumption.[10]

The appellants maintain, however, that the *timing* of the three enactments made the new conditional use for the B–5 district created by Ordinance 03–514 so atypical, and so unlike legislative action, that it should not receive the favorable presumption ordinarily afforded legislative actions. Specifically, they assert that, because in passing Ordinances 03–514 and 03–515 virtually in tandem, the City Council added to the B–5 district a conditional use for which only one property (the Arena) was eligible, and then immediately granted the conditional use to that property, the rationale for the presumption in favor of legislative action does not apply.

In support, the appellants quote the following passage from *Rylyns*, 372 Md. at 541–42, 814 A.2d 469:

> **During the legislative process of defining zones and identifying the permitted uses for each zone,** the local legislature also identifies additional uses which may be conditionally compatible in each zone, but which should not be allowed unless specific statutory standards assuring compatibility are met by the applicant **at the time *separate approval of the use is sought.*** "The special exception use is a valid zoning mechanism that delegates to an administrative Board limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption." [citation omitted]. Put another way, a special exception use is an additional use which the controlling zoning ordinance states will be allowed in a given zone unless there is a showing that the use would have **unique adverse affects** on the neighboring properties.

---

**10.** Indeed, as mentioned above, it is because an amendment to the text of a zoning ordinance is legislative in nature, and therefore is not a "zoning action," within the meaning of article 66B, section 2.09(a)(1)(ii), that the Court of Appeals held in the case at bar that the validity of Ordinance 03–514 was to be determined by means of a declaratory judgment action. *MBC,* 403 Md. at 242, 941 A.2d 1052.

(Emphasis added by the appellants.) They argue that the ordinances at issue here 1) do not qualify as a conditional use because they were not enacted during the legislative process for establishing the permitted uses in the B–5 zone and 2) violate the "requirement," as they put it, in *Rylyns,* that an application for the conditional use be made separately and at a later time than the creation of the conditional use to begin with.

We already have addressed and rejected the first argument. Legislative revision of the language of a zoning ordinance by means of a text amendment is in the nature of a legislative action, and therefore is comparable to original zoning and comprehensive zoning. The City Council passed Ordinance 03–514 by engaging in a legislative process.

We also find no merit in the appellants' second argument, which is at the heart of this appeal. The essence of this argument is that, because there was no significant time lapse between the legislative creation of the conditional use and the legislative grant of the conditional use, the use was not adopted as an abstraction, with only the welfare of the people, and not the welfare of a particular applicant, in mind; and the timing thus defeated an important objective of legislative planning and zoning—to regulate land use without engaging in favoritism.

■ We do not read the quoted language from *Rylyns* to impose a requirement that, for a conditional use to be validly adopted by a legislative body, the adoption must take place so far in advance of any decision upon an application for the conditional use that there can be no overlap in the legislative thought processes about the two. The quoted passage describes generally how the legislative process of establishing zoning districts and determining the permitted uses in each district also involves determining uses that will be permitted and prohibited in the district when special conditions are met. The passage does not impose a time or knowledge limitation upon the legislative act. Also, the passage from *Rylyns* is broadly worded, and appears to speak of the general compre-

hensive zoning process, in which, by planning and study over a period of time, districts and uses are defined and identified across the map. Here, we are dealing with a text amendment process that, while legislative in nature, is not part of an overall planning process.

It is noteworthy, moreover, that, although the conditional use in this case was created close in time to the grant of the conditional use, the conditional use standards that had to be satisfied to allow the grant are long-standing criteria, codified at sections 14–204 ("Required findings") and 14–205 ("Required considerations") of the Zoning Code. Thus, regardless of the closeness in time of the ordinance creating a conditional use for the erection of new billboards on publicly-owned stadia and arenas in the B–5 district and the ordinance granting the conditional use to the City, for the Arena property, the conditional use could not have been granted unless it comported with the same standards applicable to all conditional uses in Baltimore City that were legislatively adopted in Baltimore City decades ago. It is *that* requirement, and not a matter of timing, that removes arbitrariness and therefore favoritism from the process.

At oral argument, in response to a hypothetical question, counsel for the appellants agreed that enactment of Ordinance 03–514, creating the conditional use at issue, would have been valid if it had occurred a year before enactment of Ordinance 03–515, granting the conditional use to the City, for the Arena. We have found no authority requiring such a time lag, and see no reason to impose one judicially, and to engage in the numbers game that would follow. The conditional use criteria in the Baltimore City Zoning Code sufficiently protect against favoritism; if a time lag is to be superimposed, the City Council always may amend the Zoning Code to include one.

### (B)

### Piecemeal Zoning

The appellants assert that Ordinance 03–514 is an illegal enactment because it constitutes "piecemeal zoning."

The presumption of validity that attaches to original and comprehensive zoning does not attach to piecemeal zoning, which is the rezoning, *i.e.*, change from one zoning classification to another, of a particular property. As we have discussed above, it is to the contrary: because original and comprehensive zoning are presumed correct and valid, a piecemeal zoning change, which by definition is in derogation of the comprehensive zoning scheme, only will be approved upon "a satisfactory showing that there has been significant and unanticipated change in a relatively well-defined area (the "neighborhood") surrounding the property in question since its original or last comprehensive rezoning, whichever occurred most recently" or that "the underlying assumptions or premises relied upon by the legislative body during the immediately preceding original or comprehensive rezoning were mistakes in judgment." *Rylyns*, 372 Md. at 538, 814 A.2d 469. Piecemeal rezoning is carried out by means of a quasi-judicial process that focuses on individual grounds and scrutinizes a particular property. *Md. Overpak*, 395 Md. at 35, 909 A.2d 235. *See also Anderson House, LLC*, 402 Md. at 708 n. 17, 939 A.2d 116.

Here, there was no change in the zoning classification for the Arena property. It was in the B–5 zoning district before Ordinance 03–514 was enacted and remained in that district after it was enacted. What changed was the addition of a conditional use to the uses allowed in the B–5 district. Accordingly, there was no piecemeal zoning in this case.

### (C)

### Spot Zoning

Next, the appellants argue that Ordinance 03–514 was illegal spot zoning, or tantamount to illegal spot zoning, and therefore must be struck down.

" 'Spot zoning occurs when a small area in a [zoning district] is placed in a different zoning classification than the surrounding property.' " *Rylyns*, 372 Md. at 546, 814 A.2d 469 (quoting *Tennison v. Shomette*, 38 Md.App. 1, 8, 379 A.2d

187 (1977)). In Maryland, spot zoning is not illegal *per se.* It only is illegal if it is an arbitrary and unreasonable devotion of the small area at issue to a use that is inconsistent with the uses to which the remainder of the district is restricted and is done for the sole benefit of the private interests of the owner. *Id.* If the zoning of the small parcel is in accordance and harmony with the comprehensive plan and is done for the public good, and thus bears a substantial relationship to the public health, safety, and welfare, it is valid. *Id.*

Again, in the case at bar, the Arena property was not rezoned to a district that is substantially different from the district of the surrounding area because it was not rezoned at all; its zoning classification remained the same. Nevertheless, the appellants suggest in their opening brief, and argue directly in their reply brief, that, even if no actual zoning reclassification of the Arena property occurred, the virtually simultaneous enactment of Ordinances 03–314 and 03–315 was tantamount to a reclassification, and therefore the validity of Ordinance 03–514 must be determined using spot zoning principles. In their initial brief, they rely upon an Indiana case that is inapposite because the small area of property involved there in fact was reclassified to another zone.[11] In their reply brief, however, they discuss a recent Mississippi case that indeed held that illegal "spot zoning" had occurred even though the zoning classification of the property in question was not changed.

*Modak–Truran v. Johnson,* 18 So.3d 206 (Miss.2009), concerned a house in a residential zone in an historic area of the City of Jackson. The house was surrounded by residences on three sides and a commercial district on the fourth. By use permit, the owners were allowed to operate the house as a "Bed and Breakfast Inn, Class B." The owners wanted to start serving meals to the general public at the Inn (in addition to serving meals to their boarders). Despite opposition from their neighbors, they succeeded in obtaining from the local

---

**11.** *L & W Outdoor Advertising Co. v. Indiana,* 539 N.E.2d 497 (Ind.App. 1989).

legislative body an amendment to the language of the zoning ordinance that added "Bed and Breakfast Inn Class B with Restaurant," as a use in the residential zone and provided that the use would be permitted for any existing Class B bed and breakfast upon election, without the need to obtain a permit. "Because the [Inn] was the only Class B bed and breakfast in the city, this amendment effectively exempted [it] from having to obtain a new use permit in order to operate a restaurant." *Id.* at 208.

Neighbors challenged the amendment, arguing that it "would effectively rezone the Inn from residential to commercial," without its meeting the requirements for rezoning, thus constituting illegal "spot zoning." *Id.* at 209. Ultimately, the Supreme Court of Mississippi agreed with this argument. It concluded that the local legislature's act of amending its zoning ordinance to allow the Inn to engage in a commercial use permitted in a commercial zone but not in a residential zone was tantamount to reclassifying the Inn to the commercial zone. Echoing the same principles that underlie piecemeal zoning, the court observed:

> There can be no dispute that the amendment was designed to favor the Inn, and such preferential treatment constitutes illegal spot zoning because the City has not demonstrated "substantial evidence of change in the neighborhood in order to justify the rezoning of a small tract as an amendment in keeping with the comprehensive plan."

*Id.* at 209–10 (quoting 2 E.C. Yokley *Zoning Law and Practice* § 13–4 (4th ed. 2003)).

The circumstances in *Modak–Truran* are distinguishable from those in the case at bar. There, other zones existed—primarily commercial zones—that permitted the restaurant use the Inn owners wanted to make of their property. The zoning ordinance amendment at issue took the owners' residentially zoned property, and only that property, and allowed it to operate a restaurant as if it were zoned commercial, even though it remained zoned residential. Thus, the property was

treated by the authorities as if it had been reclassified from one zoning category to another.

In the case at bar, by contrast, there never were, and still are not, any zoning districts in Baltimore City in which new billboards were (are) permitted uses. The Billboard Moratorium removed new billboards as conditional uses in the districts that had allowed them. As the City Council had done for bus shelters, one year after the Billboard Moratorium was adopted, it made an exception to the City-wide ban, this time by enacting a conditional use for publicly-owned stadia or arenas in the B–5 district. To take advantage of the exception, such a property would have to satisfy the conditional use criteria we have discussed above. Thus, the local legislative body in this case was not treating the Arena property as if its zoning classification had been changed; it was adopting a zoning vehicle for the owner of the property to use to seek to obtain an exception from the Billboard Moratorium. The situations are not comparable.

### (D)

### Contract Zoning

Finally, the appellants maintain that Ordinance 03–514 is invalid because it constitutes illegal contract zoning. "[Contract zoning] occurs when an agreement is entered between the ultimate zoning authority and the zoning applicant/property owner which purports to determine contractually how the property in question will be zoned, in derogation of the legal prerequisites for the grant of the desired zone." *Rylyns*, 372 Md. at 547, 814 A.2d 469. "Absent valid legislative authorization, [contract zoning] is impermissible because it allows a property owner to obtain a special privilege not available to others, disrupts the comprehensive nature of the zoning plan, and most importantly, impermissibly derogates the exercise of the municipality's powers." *Id.* (citations omitted).

In rejecting the appellants' contract zoning argument, the circuit court ruled that 1) Ordinance 03–514 did not grant a

special privilege to the Arena property owner merely because the Arena is the only property in the B–5 district that is eligible for the conditional use; 2) the ordinance was in harmony with the comprehensive zoning plan for Baltimore City; and 3) the ordinance did not contractually bind the City to anything so as to impermissibly derogate its powers.

We agree with the circuit court that the undisputed facts could not support a reasonable finding that the City engaged in illegal contract zoning.  There is no evidence in this record of a contract of any sort between the City Council, as the zoning authority, and the City and Hale, as the applicants, agreeing as to how the Arena property would be zoned, or about the zoning status of the property, that amounted to the "contract[ing] away of [the City Council's] zoning power." *Attman/Glazer P.B. Co. v. Annapolis*, 314 Md. 675, 676, 552 A.2d 1277 (1989).  In that case, the Annapolis zoning authority and certain private parties had attempted to resolve a property dispute by means of a settlement agreement that called upon the zoning authority to grant a conditional use to a property owner/applicant on specified conditions.  When problems arose, the property owner/applicant sought to enforce the agreement.  Ultimately, the court invoked the "familiar premise that a municipality may not contract away the exercise of its zoning powers" and held that "the mayor and aldermen of Annapolis could not by agreement lawfully bind themselves to a future zoning or conditional use decision." *Id.* 685, 552 A.2d 1277. *See also Baylis v. City of Baltimore*, 219 Md. 164, 170, 148 A.2d 429 (1959).

As we have observed, and by contrast, there is no suggestion in the case at bar of any *agreement* by the City Council with the Arena property owner or tenant to rezone the property or create and then grant a conditional use for the property at all or such that the City Council had bargained away its zoning powers.  The facts, undisputed by the parties, established that the City Council enacted Ordinance 03–514 in the ordinary course of events, without an agreement to do so.  To be sure, the City and Hale, as the Arena property owner and primary tenant, wanted the ordinance creating the condi-

tional use enacted; there was no prior agreement by the City Council to do so, however.

We agree, moreover, with the circuit court's conclusion that on the undisputed facts Ordinance 03–514 harmonized with the comprehensive zoning plan for Baltimore City and did not grant a special privilege to the City as the owner of the Arena.

Since 2000, Baltimore City's zoning plan, as evidenced by its Zoning Code, has had as one purpose to eliminate the proliferation of billboards in the City, by banning the erection of new billboards. Ordinance 03–514 as enacted required that certain existing billboards be removed for every new billboard actually allowed as a conditional use on a publicly-owned arena or stadium. Thus, the number of billboards in Baltimore City was not increased by virtue of this conditional use ordinance; and therefore the ordinance was in harmony with the comprehensive plan.

Finally, Ordinance 03–514 did not confer a special privilege upon the City, as owner of the Arena—or Hale as its primary tenant, for that matter—because it only made the Arena property *eligible* to apply for the conditional use permit for new billboards. The City still had to meet the criteria necessary to obtain the conditional use, as would any conditional use applicant. If, upon doing so, the City obtained for the Arena the right to erect new billboards on the Arena after the City Council had determined that such a use was consistent with Baltimore City's overall zoning scheme, the City could not be said to have been treated with special favor.

## II.

### *Ordinance 03–515 (Judicial Review)*

The standard of review in an appeal from an action for judicial review is well-established. Generally speaking, we review the final agency action, not the decision of the circuit court upholding or reversing that action. *See, e.g., Trinity Assembly of God v. People's Counsel for Baltimore County,* 407 Md. 53, 77, 962 A.2d 404 (2008). We will affirm

the agency's factual findings if they are supported by substantial evidence in the agency record. *Id.* at 78, 962 A.2d 404. We review legal decisions by the agency *de novo,* although we often will give deference to an agency's interpretation and application of the statute it administers. *Id.*

■ In the case at bar, the final agency action was the decision by the City Council to enact Ordinance 03–515, granting a conditional use to the City for the Arena property to erect 14 new billboards so long as 14 billboards located elsewhere in the City were removed. The ordinance granted permission for the "establishment, maintenance, and operation of general advertising signs" on the Arena property "as outlined in red on the plat accompanying this Ordinance, in accordance with Zoning Code § § 6–609(3a) and 1–102 of the Baltimore City Code," subject to enumerated exceptions. Among other things, the conditions attached the pertinent drawings attached to the ordinance; set forth in detail the design standards for the new billboards, including for example their precise sizes and provisions for lighting; and specifically designated the 14 billboards that had to be removed for the new billboards to be erected.[12]

The City Council enacted Ordinance 03–515 after consideration of the Staff Report. Section 16–304 of the Zoning Code states in relevant part: "For a bill proposing the approval ... of a conditional use, the ... Planning Commission must base [its] recommendations to the Council on the considerations required by Title 14 {"Conditional Uses"} of this article." Those "Required Considerations" are set forth at Zg section 14–205, which provides, at subsection (a):

*In general.*

As a further guide to its decision on the facts of each case, [the City Council] must consider the following, where appropriate:

---

12. The 14 billboards actually were in batches, so that some of the 14 included more than one sign to be removed. A total of 24 billboards were designated for removal.

(1) the nature of the proposed site, including its size and shape and the proposed size, shape, and arrangement of structures;

(2) the resulting traffic patterns and adequacy of proposed off-street parking and loading;

(3) the nature of the surrounding area and the extent to which the proposed use might impair its present and future development;

(4) the proximity of dwellings, churches, schools, public structures, and other places of public gathering;

(5) accessibility of the premises for fire and police protection;

(6) accessibility of light and air to the premises and to the property in the vicinity;

(7) the type and location of adequate utilities, access roads, drainage, and other necessary facilities that have been or will be provided;

(8) the preservation of cultural and historic landmarks;

(9) the provisions of the City master Plan;

(10) the provisions of any applicable Urban Renewal Plan;

(11) all applicable standards and requirements of this article;

(12) the intent and purpose stated in § 1–401 {"Purposes of article"} of this article; and

(13) any other matters considered to be in the interest of the general welfare.

The appellants contend the City Council's decision to grant the conditional use is not supported by substantial evidence in the record because the Staff Report, upon which the City Council relied, does not contain express references to four of the conditional use considerations set forth in section 14–205(a). They argue that these deficiencies were not cured by findings made by the circuit court because in an action for judicial review it is the findings of the agency (here, the City

Council, as reflected in the ordinance and the Staff Report), not the circuit court, that are under review.

In particular, the appellants lodge the following complaints.

First, the appellants focus on Zg section 14–205(a)(4), which is "the proximity of dwellings, churches, schools, public structures, and other places of public gathering" factor. They point out that, although the Staff Report noted that "Commercial signage would be inappropriate in residential districts," it did not make any comment about the proximity of apartment buildings to the Arena property.

The Staff Report includes the following observations about the area of the city in which the Arena is located:

This bill [referring to Ordinance 03–515] amends the [Z]oning Code to allow for general advertising signs on publicly-owned stadiums and arenas in B–5 zoning districts. This will be the second exception to the [Billboard Moratorium]. The first exception was for general advertising signs on passenger bus shelters. . . .

The planning Department staff recommended that the use be allowed in the B–5 zoning district. *This zoning category is the densest downtown zoning category, and the Code limits the geographic location of B–5 to the Central Business District. This B–5 Zoning District is a category meant to allow dense development and to provide for public gathering. It is the hub of the city.*

*The Planning Department also recommends that the use be limited to publicly-owned stadiums and arenas. These are the facilities that provide services to the general public.* Privately owned stadiums are located throughout the City. [They] also usually serve only one segment of the population, not the general public. For example, a university's stadium services those associated with the university. *Universities and other privately-owned stadiums are also frequently found in residential districts. Commercial signage would be inappropriate in residential districts.*

(Emphasis added.)

The quoted analysis makes plain that the Staff Report took into consideration the location of the proposed use—new large

billboards on three of the Arena's exterior walls—*vis-à-vis* the uses in the surrounding area, which is the essence of factor (a)(4) of Zg section 14–205. The Staff recognized that the area of the city in which the Arena is located is zoned to be the densest and most highly commercially developed part of the city, and the area in which high concentrations of people gather for public events. It is the opposite in nature to areas of the city that are zoned residential, where billboards would be the least suitable and the most intrusive.

Nothing about the Staff Report's analysis suggests that the planning staff was unaware that there is some residential development now taking place in Baltimore City's core central business district or that it ignored that fact. However, the Staff considered the primarily commercial nature of the Arena to be foremost in recommending the use for that area. We cannot say that the Staff Report was deficient with respect to factor (a)(4) of Zg section 14–205.

Second, the appellants maintain that, because Zg section 14–205(a)(9) requires consideration of "the provisions of the City Master Plan" and Zg section 14–205(a)(10) requires consideration of "any applicable Urban Renewal Plan," the Staff Report should have determined that Ordinance 03–515 was in accordance with the "goals and objectives" of the Billboard Moratorium, which is part of the City Master Plan. They argue that the Report's analysis was "deficient because it failed to identify the Billboard Moratorium's 'goals and objectives'" and should have "identified [the] Moratorium's purpose as a 'general prohibition' against new billboards, to avoid 'clutter and blight and … negative aesthetic impact....'" (Quoting Ordinance 00–0001.) They further argue that "concentrating" 14 "behemoth" billboards in the hub of the city could not possibly be in accordance with the Billboard Moratorium's objective of removing clutter and blight, as doing so "intensified" clutter and blight.

Contrary to the appellants' argument, the Staff Report in fact considered the goals and objectives of the Billboard Moratorium. The Staff Report:

- observed that new general advertising signs are prohibited in Baltimore City, except for bus shelters;
- noted that CPHA was requesting that, as a condition to granting the conditional use to the City for the erection of new billboards on the Arena, other billboards located elsewhere in the City be removed; and
- recommended that such a condition be adopted, so that, for approval of 14 new billboards for the Arena, 14 other billboards be taken down.

The Staff Report went on to recommend particular signs to be removed, focusing on those that had been of "grievous concern" to the advocates of the Billboard Moratorium. Moreover, it recommended against a request by the appellees to include an "electronic message board" with advertisements among the new billboards, commenting that, allowing "fluctuating signs" runs contrary to the "major goal in most commercial areas in the City" to "reduc[e] sign clutter."

It is plain from the Staff Report's recommendations that the Planning Commission was of the view that the goals and objectives of the Billboard Moratorium would be advanced by allowing a concentration of new billboards in one area, on one building, in the City's hub, while at the same time removing an equal number (which indeed became a greater number) of old billboards from areas scattered around the City. Reasonable people reasonably could conclude that this would be an effective approach to reducing "sign clutter."

Third, the appellants argue that the Staff Report did not comport with Zg section 14–205(a)(13). They assert that, under that section, the Staff Report was required "to consider 'matters considered to be in the interest of the general welfare,'" but that there was no finding on that issue. In fact, subsection (a)(13) requires consideration of "any other matters considered to be in the interest of the general welfare." As this wording makes plain, it was within the judgment of the Planning Commission staff whether any other such matter existed. Accordingly, there was no need for the Staff Report to specifically identify that factor. Moreover, we agree with

the appellees that other matters, in particular the economic benefit of allowing income-generating billboards on the Arena, implicitly were taken into account in the Staff Report.

The Staff Report explained that Oriole Park at Camden Yards and M & T Bank Stadium are not subject to local zoning laws, as they are State-owned, and therefore are able to erect billboards. Moreover, "most of the major sport complexes in major cities also allow advertising on the exteriors of their facilities." The ordinances would place the Arena on an equal footing with the other publicly-owned sports facilities in Baltimore City and in other large cities in the United States.

When revenue generated by billboards on large sports facilities in major cities goes directly to the municipalities, the economic benefit to the municipality is obvious. When the revenue goes to a private owner of a sports team housed in a complex in a city, the municipality likewise benefits economically because the owner is incentivized to keep its team in the city; and the team's presence in the city generates revenue for the city. The Staff Report's stated objective of putting the Arena on an equal footing with large sports complexes elsewhere in respect to billboard advertising revenue rests on this premise. Accordingly, it is implicit in the Staff Report's recommendation that the Planning Commission considered the grant of the conditional use to the City, for the Arena, economically advantageous to Baltimore City.

For the reasons we have explained, the City Council's decision to enact Ordinance 03–515, thus granting a conditional use to the City to erect new billboards on the Arena, is supported by substantial evidence in the record and was not legally incorrect.

## III.

### Standing

Finally, the appellants complain that, on remand from the Court of Appeals, the circuit court "challenged" their standing

to contest the grant of the conditional use to the City, for the Arena property. They say:

> While admitting an apparent absence of statutory or case authority, the [c]ourt below insinuated a lack of standing to challenge Ord. No. 03–515 because all twelve Petitioners did not appear personally at the City Council hearings. Petitioners' organization, Westside Renaissance, Inc., did appear through counsel, however, as the lower court noted.

(Citations to Record Extract omitted.)

The City responds by pointing out that, regardless of what the trial judge may have suggested, she did not rule that the appellants lacked standing to challenge Ordinance 03–515; therefore, there is no standing decision to challenge on appeal. They say:

> Although the [c]ircuit [c]ourt referred to the fact that [the] [a]ppellants themselves did not participate before the Land Use Committee of the City Council, its discussion of this issue was simply *dicta*. [The judge] never concluded that [the] [a]ppellants lacked standing, did not rely on such a conclusion to reach any decision in this matter, and did not decide the case on this basis.

The record supports the City's assertion. The issue of standing was neither raised nor decided below, and the court's rulings were not based upon standing. Accordingly, there is no standing issue properly before us. Md. Rule 8–131(a).

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.**