*Bradley E. Heard v. County Council of Prince George's, et al.*, No. 1794, Sept. Term 2022. Opinion filed on February 2, 2024, by Wells, C.J.


**ZONING – STANDING – AGGRIEVEMENT**

A protestant has standing under Maryland Code Annotated, Land Use ("LU") Article section 22-407(a)(1) to seek judicial review of a final zoning decision so long as the protestant satisfies each of the criteria listed there. Additionally, the protestant must demonstrate aggrievement, meaning that the decision will adversely affect the protestant's interests in a personal and specific manner not shared by the public. The proximity of the protestant to the affected area is the most important factor in establishing aggrievement.

Here, the County Council for Prince George's County, acting as the county's zoning authority, the District Council, passed CB-42-2021, which changed the Table of Uses in an R-55 residential zone to allow an eleemosynary entity to operate in a defunct public school. Appellant Bradley Heard has demonstrated that he lives approximately 800 feet from the subject property. Additionally, Heard has shown under the "non-demanding" statutory requirements of LU § 22-407 that he and other neighboring county residents would suffer a pecuniary loss because of the District Council's decision. He, therefore, has standing to contest the District Council's passage of CB-42-2021.


**ZONING – REGIONAL DISTRICT ACT – COUNTY CHARTER**

Prince George's and Montgomery Counties are parties to the Maryland-National Capital Park and Planning Commission (M-NCPPC), a legislatively created body that administers certain park development, as well as planning and zoning functions in those counties. The Maryland-Washington Regional District Act (RDA), embodied in LU § 22-104(a), authorizes the Prince George's District Council, through the M-NCPPC, to adopt, amend and administer zoning laws within the county. Because the RDA is the "exclusive source of zoning authority in those areas of Prince George's County which it covers," we hold that the zoning provisions of the county's Charter have been superseded by the RDA. Consequently, assent from the County Executive and any charter-related time constraints are inapplicable to zoning actions such as CB-42-2022.


**ZONING – SPOT ZONING – VALID PUBLIC PURPOSE**
"Spot zoning occurs when a small area in a [zone] district is placed in a different zoning classification than the surrounding property." Here, the District Council did not rezone the

subject property but changed the Table of Uses for the R-55 residential zone to allow a charitable organization to redevelop and then operate out of a long-shuttered public school. Further, a use permitted in a small area, which is not inconsistent with the use to which the larger surrounding area is restricted, although it may be different from that use, is not "spot zoning" when it does not conflict with the comprehensive plan. In this case, the proposed use of the defunct school was consistent with the county's comprehensive plan and was for a valid public purpose and, therefore, does not constitute spot zoning.

Circuit Court for Prince George's County
Case No. CAL21-08992

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1794

September Term, 2022
_____

BRADLEY E. HEARD

v.

COUNTY COUNCIL OF PRINCE
GEORGE'S COUNTY, SITTING AS
DISTRICT COUNCIL, ET AL.
_____

Wells, C.J.,
Nazarian,
Tang,

JJ.
_____

Opinion by Wells, C.J.
_____

Filed: February 2, 2024

This appeal arises from a judgment of the Circuit Court for Prince George's County dismissing appellant Bradley Heard's petition for judicial review of co-appellee Prince George's County Council's[1] enactment of zoning bill CB-42-2021—an ordinance that amended the R-55 (single-family detached residential) zone to allow for the adaptive reuse of an abandoned public-school building by the Mission of Love Charities, the other appellee (for convenience both appellees will be referred to as "the District Council"). The circuit court did not reach the merits of Heard's claims finding that he lacked both property owner and taxpayer standing to challenge the passage of the bill.

Heard asks us to resolve three questions, which we have rephrased:[2]

1. Does Heard have standing to challenge the District Council's enactment of CB-42-2021?

---

[1] Under the Maryland Regional District Act ("RDA"), the County Council, sitting as the District Council, has the authority to review and decide zoning and land use matters for most of Prince George's County.

[2] Heard's verbatim questions to us read:

1. Did the Circuit Court err in finding that Appellant lacked standing to seek judicial review of the District Council's legislative enactment of CB-42-2021?

2. Did the District Council's enactment of CB-42-2021 constitute a valid and enforceable local zoning law within the meaning of the Regional District Act, given that (a) the enacted legislation was neither presented to nor approved by the County Executive in accordance with Section 411 of the Prince George's County Charter, and thus never became a local law, or (b) the enacted non-emergency legislation was designated to take effect "on the date of its adoption," rather than 45 calendar days after it became law, in violation of Section 318 of the Prince George's County Charter?

3. To the extent that the District Council's enactment of CB-42-2021 constitutes a facially valid local zoning law within the meaning of the Regional District Act, is the regulation nevertheless ultra vires and unenforceable, given that it constitutes unlawful spot zoning?

2. Did the District Council legally enact CB-42-2021?

3. Even if CB-42-2021 was validly enacted, did the District Council exceed its authority because the ordinance constitutes "spot zoning?"

For the reasons that we discuss, we reach a different conclusion from the circuit court and determine that Heard has standing to challenge the District Council's passage of CB-42-2021. On the merits, we conclude the legislation was legally enacted and does not constitute spot zoning. The ordinance is, therefore, valid and enforceable within the meaning of the RDA.

## BACKGROUND

On June 8, 2021, six members of the Prince George's County Council proposed and presented the first draft of CB-42-2021 to the District Council.[3] It provided:

> (E) A former public-school building, currently or previously located in a Development District Overlay Zone, where the building is greater than 10,000 sq. ft in gross floor area and the building is situated on a lot or parcel exceeding 2 acres, can be adaptively reused primarily by an eleemosynary, philanthropic or non-profit institution, established prior to (date) and whose previous office headquarters was within 150 yards of the school building. The adaptive user can also operate, sell or lease space within the building to an entity or entities in any use permitted in the CSC zone. (Emphasis added)

The property at issue is known as the Lyndon Hills School located at 6181 Old Central Avenue. The school has sat unused and vacant for several years.

On June 17, 2021, the Prince George's County Planning Board[4] submitted written comments on the first draft of the bill. The Planning Board noted that the bill would run

---

[3] They were Councilmembers Streeter, Davis, Ivey, Franklin, Taveras, and Glaros.

[4] The Prince George's County Planning Board, together with the Montgomery County Planning Board, makes up the Maryland-National Capital Park and Planning Commission (M-NCPPC)—a bi-county agency that acquires, develops, maintains and administers parks and plans for land use in both counties, respectively.

counter to the 2000 Addison Road Metro Approved Sector Plan and Sectional Map Amendment because the property was subject to a Development District Overlay Zone (DDOZ), which has its own separate process to amend the table of uses in the DDO Zone.[5] In its report, the Planning Board noted "there is an existing process where a property owner can request an amendment to permit use in a DDOZ."

On July 1, 2021, before the County Council sitting as the Committee of the Whole ("COW"),[6] the bill's principal sponsor, then-councilmember Rodney Streeter, noted that this legislation was critical to the continued operation of the Mission of Love Charities, Inc., a small nonprofit human services organization located directly across the street from the old Lyndon Hill School property at 6180 Old Central Avenue.

To address the Planning Board's concern about the DDOZ, Councilmember Streeter moved to amend CB-42-2021. The amendment provided:

> (E) Eleemosynary or Philanthropic Institution. Notwithstanding any provision to the contrary in Section 27- 548.22, or any general provisions of Part 10A, Division 3 of the Zoning Ordinance, the adaptive reuse of a former public school building, currently or previously located in a - 10 - Development District Overlay Zone, where the building is greater than 10,000 sq. ft in gross floor area and the building is situated on a lot or parcel exceeding 2 acres, and can be adaptively reused primarily by an eleemosynary, or philanthropic institution, providing social services to the community and whose previous office headquarters was within 150 yards of the school building with a validly issued occupancy permit prior to May 1, 1999. The use is permitted by right and the operator can also sell or lease no

---

[5] A Development District Overlay Zone ("DDO Zone") is a mapped zone that is superimposed over one or more designated development districts by a Sectional Map Amendment to ensure that the development meets the goals established in a Master Plan, Master Plan Amendment, or Sector Plan. Accordingly, a DDO Zone may modify development requirements within the underlying zones. Prince George's County Code of Ordinances ("PGCC") § 27-548.19.

[6] Items referred to the Committee of the Whole are considered, and a recommendation is then made to the full District Council.

more than 49% of the space within the building to an entity or entities to engage in any use permitted by right in the CSC zone. (Emphasis added).

Put differently, the bill amended the table of permitted uses for the R-55 (residential single-family detached) zone to allow for the adaptive reuse of a former public-school building that is:

> (1) currently or previously located in a Development District Overlay Zone;

> (2) where the building is greater than 10,000 sq. ft. in gross floor area;

> (3) is situated on a lot or parcel exceeding 2 acres;

> (4) can be adaptively reused primarily by an eleemosynary, or philanthropic institution[7], providing social services to the community; and

> (5) whose previous office headquarters was within 150 yards of the school building with a validly issued occupancy permit prior to May 1, 1999.

The amendment adds that "this use is permitted by right and the operator can also sell or lease no more than 49% of the space within the building to an entity or entities to engage in any use permitted by right in the CSC [commercial shopping center] zone."[8]

Prior to a vote on the amendment, staff attorney for District Council, Karen Zavakos, the Acting Director of Prince George's County's Department of Planning, Housing & Economic Development, provided the following explanation for the amendment:

> Thank you, Mr. Chair, Members of the Council. I bring this Amendment No. 1 explanation to you by way of a quick introductory explanation. One, this

---

[7] An eleemosynary or philanthropic institution is defined, in relevant part, as "any facility operated by a private, nonprofit organization offering religious, social, physical, recreational, emergency, or benevolent services, and which is not already specifically allowed in the various zones." PGCC § 27-107.01(a)(82).

[8] PGCC § 27-441(b).

bill went straight to introduction. So, as sometimes, you know, when we get into a situation where time is of the essence, we have in the past gone straight to introduction which means that no further amendment may be made to the bill without readvertising it. So, remember, this bill didn't go to committee, and it came out no recommendation 10-0.

The reason for this is because we could not get, not yet, as Councilmember Streeter explained, put together an Amendment No. 1 which is not an amendment of substance. So, what the Amendment No. 1 does, this appears on page 128 of your virtual binder. The change is simple. It seeks to replace wholesale the proposed new footnote to the use tables.

What you have here is property that, as Mr. Horne explained, is desirous of continuing its use; but it is within a Development District Overlay Zone. The reason I bring that up is because, as you know, your new ordinance will extinguish the Overlay Zones. So, this bill, while Mr. Horne absolutely point out, is helpful to this particular project, it could potentially be helpful to other projects that are subject to the Development District Overlay Zone without having unintended consequences.

So, specifically what the next text of proposed Subsection E in the table will do is it clarifies that this is notwithstanding any provision to the contrary of how the Development District Overlay work, and this is a signal that this is going to be the way that the ordinance will work when the new zoning ordinance takes effect.

The District Council voted to unanimously adopt the amendment. There was also a motion to make the bill effective on the date of adoption, which also carried unanimously. Finally, the bill was unanimously enacted.

Heard filed a petition for judicial review of District Council's actions in the Circuit Court for Prince George's County and alleged his standing as follows:

Petitioner avers that the District Council's enactment of CB42-2021 was illegal or ultra vires, and that the action may injuriously affect Petitioner's property and that of other Prince George's County taxpayers, inasmuch as the legislation reasonably may result in a pecuniary loss to Petitioner and other taxpayers, or in an increase in their taxes. Accordingly, Petitioner is aggrieved by the District Council's action.

In his Memoranda in Support of his Petition, Heard further advanced standing, as follows:

5

> Petitioner is a taxpayer, property owner, local community activist, lawyer, blogger, and nonprofit executive who resides nearby to the former Lyndon Hill School property. *** Petitioner has averred that the District Council's enactment of the challenged legislation may injuriously impact Petitioner's property and that of other Prince George's County taxpayers, inasmuch as the legislation reasonably may result in a pecuniary loss to Petitioner and other taxpayers, or in an increase in their taxes.

Heard argued that the bill was an invalid and unenforceable local zoning law because, *first*, it was enacted in contravention of the county charter. This was because, Heard asserted, the bill was never presented to the County Executive and therefore never became a local law. *Second*, Heard contended CB-42-2021 constitutes unlawful "spot or contract zoning,"[9] because it allows for eleemosynary and philanthropic uses in a detached, single-family residential zone, and it was clearly crafted solely for the benefit of Mission of Love.

In their joint answer to the petition for judicial review, the District Council asserted that Heard had no standing. It argued that taxpayer standing was inapplicable to final actions of the Prince George's County District Council. Instead, Maryland Code Annotated, Land Use (LU) Article § 22-407 and assorted appellate authority holds that LU § 22-407 provides the grounds to seek judicial review, abrogating the common law ground

---

[9] In his memorandum in support of judicial review Heard argued that:

> Spot zoning occurs when a small tract of land is treated differently than a larger tract of adjacent land. Spot zoning is unlawful where it is arbitrary and unreasonable, made for the sole benefit or private interests of a property owner and is inconsistent with the governing comprehensive plan. *Id.* Contract zoning occurs where an agreement is reached between a property owner and the zoning authority to determine how the subject property will be zoned, in derogation of the otherwise applicable legal prerequisites for the zone.

(Citations omitted.)

6

of taxpayer standing. Further, under LU § 22-407, it argued Heard is not specially aggrieved because he cannot offer "'plus factors' supporting injury."

If the circuit court found that Heard was aggrieved and had standing, the District Council argued that Heard's petition still had to fail. *First*, it asserted that CB-42-2021 was lawfully enacted in accordance with the RDA and the Zoning Ordinance and was not subject to the county's charter, as Heard claimed.

*Second*, it maintained that CB-42-2021 did not constitute spot or contract zoning. The bill did not engage in spot zoning because the District Council did not place the Lyndon Hills School property in a different zoning classification from the surrounding area. Instead, the District Council only amended the table of uses for the R-55 (residential) zone to allow the abandoned school to be used for charitable purposes within that zone. Further, it argued the enactment of CB-42-2021 did not constitute contract zoning,[10] principally because Heard offered no evidence to suggest the District Council and Mission of Love Charities entered into an agreement about how the Lyndon Hills School property would be zoned.

After a hearing on February 11, 2022, the circuit court issued a memorandum and order on November 30, 2022. The court reserved the bulk of the discussion in its memorandum to the issue of Heard's standing. While the court acknowledged the two

---

[10] In their memorandum, the District Council state:

> Contract zoning occurs "when *an agreement is entered between the ultimate zoning authority and the zoning applicant/ property owner which purports to determine contractually* how the property in question will be zoned, in derogation of the legal prerequisites for the grant of the desired zone."

(Emphasis in the original. Citation removed.)

principal means a challenger to a zoning ordinance may establish standing, either as a property owner or taxpayer, the court determined that Heard had not established standing under either theory. As for property owner standing, the court found that Heard had not proven that he was *prima facie* aggrieved because his home did not touch or abut the Lyndon Hills School property as required. Further, the court declared that Heard had not established that he was "almost *prima facie* aggrieved," a second way to establish property owner standing, the court found though Heard lived close to the Lyndon Hills School property, he didn't prove any "plus factors" suggesting aggrievement.

"Plus factors," as we will discuss in detail later, are considerations aside from living close to the disputed property, that would give a litigant a personal stake in the outcome of the zoning decision. Examples of "plus factors" include allegations the enactment would reduce property values, or create excessive and unsafe vehicular traffic, hazardous water runoff, excessive sewage disposal, over-crowded schools, and the like. *See generally Ray v. Mayor and City Council of Baltimore*, 430 Md. 74, 84–85 (2013). As the court saw it, the first plus factor that Heard claimed was that the redevelopment of the school property could reduce the value of his home and surrounding property. An allied plus factor that Heard argued was that the property could be better developed to benefit everyone in the surrounding area. Citing *Ray*, 430 Md. at 83, the court acknowledged that a property owner's lay opinion of decreased property values could suffice as a plus factor to support a claim of special aggrievement. But the court rejected Heard's "forecast" or "potential" that his and his neighbors' property values would be reduced because the court found that property had not been re-zoned and the that the "future prospect" of decreased property values was too speculative and that proof would have required expert testimony.

8

As a prelude to its findings on taxpayer standing, the court rejected the District Council's contention that LU § 22-407 offered the only basis for Heard to challenge the District Council's passage of CB-42-2021. After considering the Supreme Court of Maryland's decision in *Chaney*, the circuit court concluded:

> This [c]ourt interprets *Chaney*[11] to have simply found property owner standing as applicable in that case, because the facts and circumstances of that case, satisfied the requirements of property owner standing, as opposed to taxpayer standing. Therefore, this Court does not believe that based upon *Chaney*, that [Heard's] options were limited. In fact, [Heard] had the option to challenge any alleged illegal or *ultra vires* legislative enactment relating to land, by way of property owner or taxpayer standing, assuming that the facts and circumstances allowed it.

Consequently, the court turned to Heard's assertion of taxpayer standing.

The circuit court found that Heard had not established the grounds to prove taxpayer standing. Essentially, the court concluded that Heard had not adequately demonstrated that the passage of CB-42-2021 would result in a pecuniary loss or an increase in taxes to him or others who lived nearby. The court concluded that Heard's claims were "conclusory, vague[,] and speculative." Further the court determined that Heard's opinions about how the land should be developed, and concerns about the impact of the planned development, were unsupported by expert testimony. As a result, the court dismissed Heard's petition.

Heard filed a timely appeal. Additional facts will be included as needed.

## STANDARD OF REVIEW

When acting in its zoning capacity, the District Council acts as an administrative agency. *Grant v. Cnty. Council of Prince George's Cnty.*, 465 Md. 496, 503 (2019); *Cnty. Council of Prince George's Cnty. v. Brandywine Enters., Inc.*, 350 Md. 339, 342, (1998).

---

[11] *Cnty. Council of Prince George's Cnty. v. Chaney Enters. Ltd. P'ship*, 454 Md. 514 (2017).

9

"When we review the final decision of an administrative agency, . . . we look through the circuit court's . . . decisions, although applying the same standards of review, and evaluate the decision of the agency." *Heard v. Prince George's Cnty.*, 256 Md. App. 586, 609 (2022) (citing *People's Counsel for Balt. Cnty. v. Loyola College*, 406 Md. 54, 66-67 (2008)). When an administrative agency (such as the District Council) is acting in a manner that may be considered legislative in nature (*i.e.*, quasi-legislative), the scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries. *See Town of Upper Marlboro v. Prince George's Cnty. Council*, 480 Md. 167, 180–81 (2022). Once a reviewing court has satisfied itself that the agency was acting within the scope of its authority and not otherwise contrary to law, its review ends. *Lewis v. Gansler*, 204 Md. App. 454, 483 (2012). As will be discussed, we hold that CB-42-2021 was in the nature of a legislative action.

Under LU § 22-407(e)(3)(i-vi), the circuit court may only reverse or modify the District Council's decision "if the substantial rights of the petitioner have been prejudiced because the district council's action is:"

> (i) unconstitutional;
> (ii) in excess of the statutory authority or jurisdiction of the district council;
> (iii) made on unlawful procedure;
> (iv) affected by other error of law;
> (v) unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or
> (vi) arbitrary or capricious.

We review legislative decisions only for legality, which implicates only provisions (i) through (iv) of the list above. *Town of Upper Marlboro*, 480 Md. at 180-81. Review for legality "is an even more limited standard than the already narrow review for arbitrary and

capricious action, or for action unsupported by substantial evidence." *Talbot Cnty. v. Miles Point Prop., LLC*, 415 Md. 372, 393 (2010).

## DISCUSSION

I. **Heard Has Standing to Contest the District Council's Passage of CB-42-2021.**

Before we address the merits of Heard's two claims, we first consider the issue of standing. Heard asserts standing under a variety of theories, including property owner and taxpayer standing, as well as by virtue of LU § 22-407. On the other hand, the District Council maintains that Heard has not proven standing under any of the theories named.

*A. Land Use Article § 22-407*

We begin our discussion of standing with Heard's assertion that LU § 22-407 grants him standing to seek judicial review of the District Council's passage of CB-42-2021. The District Council does not disagree but argues that, because the statute is the exclusive means by which challengers like Heard may obtain judicial review, taxpayer standing is now closed as an avenue of seeking redress and we should therefore not consider Heard's argument that he has taxpayer standing. More importantly, it asserts that, under the statute, Heard is required to show that he is "especially aggrieved" which it claims he cannot do.

For our purposes, the important part of LU § 22-407 is subsection (a)(1) which reads:

> (a)(1) **Judicial review of any final decision of the district council**, including an individual map amendment or a sectional map amendment, **may be requested by any person or entity that is aggrieved by the decision of the district council and is:**
> (i) a municipal corporation, governed special taxing district, or **person in the county**;
> (ii) a civic or homeowners association representing property owners affected by the final decision;
> (iii) the owner of the property that is the subject of the decision; or

11

(iv) the applicant.

(Emphasis added). No one disputes that the District Council's actions here constitute a "final decision." The record reflects Heard is a resident of Prince George's County and owns property there. He must also show that he is "aggrieved."

Generally, a party is deemed aggrieved if the party can demonstrate that the decision will adversely affect the party's interest in a personal and specific manner, not shared by the general public. *See Ray*, 430 Md. at 81. There are three ways a party may prove standing: (1) proximity; (2) special aggrievement; or (3) direct and specific harm. *See id.* at 85–86. "A protestant is *prima facie* aggrieved when his proximity makes him an adjoining, confronting, or nearby property owner." *Id.* at 85. A protestant is specially aggrieved when the party is farther away than an adjoining, confronting, or nearby property owner, but "still close enough to the site" to be considered "almost *prima facie* aggrieved, *and* offers 'plus factors' supporting injury." *Id.* Finally, a protestant who is far removed from the subject property may still have standing if the party can show "his personal or property rights are specially and adversely affected by the board's action." *Id.* at 85–86.

Where standing is at issue in contesting a zoning decision, "proximity is the most important factor to be considered." *Id.* at 82–83. While there is "no bright-line rule for exactly how close a property must be in order to show special aggrievement[,]" generally, a protestant must demonstrate that they live no more than 1,000 feet from the subject property and offer "plus factors" such as "an owner's lay opinion of decreasing property values and increasing traffic[.]" *Id.* at 83–85, 91–92.

12

In his petition for judicial review and in a letter Heard sent to then-Council chair, Calvin S. Hawkins, II, in opposition to CB-42-2021, Heard lists his address as 415 Zelma Avenue, Capitol Heights, Maryland. The District Council does not dispute that Heard lives at that address. Additionally, in its memorandum and order of November 30, 2022, the court found that Heard lives approximately 800 feet from the Lyndon Hill School property. There is no reason to dispute that determination. Thus, Heard has demonstrated that he lives close enough to the contested site to qualify for special aggrievement based on proximity.

In addition, Heard offers as a plus factor that passage of CB-42-2021 "may injuriously impact [Heard's] property and that of other Prince George's County taxpayers, inasmuch as the legislation reasonably may result in a pecuniary loss to [him] and other taxpayers, or increase their taxes." In a footnote, Heard also describes how the use of the Lyndon Hill school site would stymie the full development of the area. Further, he suggests how the site might be better developed. The District Council claims that Heard offers no plus factors. They say his allegation concerning the potential economic loss that the property would have to him and other residents as well as the potential for increased taxes, go to taxpayer standing, which the District Council says LU § 22-407 preempted.

The Supreme Court of Maryland's (at the time called the Court of Appeals) decision in *Chatham Corp. v. Beltram*, 252 Md. 578 (1969), is helpful. In *Chatham*, two homeowners opposed the Zoning Board of Howard County's approval of a decision reclassifying a residential zoning district to permit apartments. *Id.* at 579–80. Both homeowners testified that their property was approximately 1,000 feet from the subject property and that they believed the rezoning would depreciate the value of their

13

property. *Id.* at 580. In light of this testimony, the Court held that the homeowners were specially aggrieved. *Id.* at 584.

We conclude by observing that Heard's assertions in his written comments opposing CB-42-2021 and in his motion for judicial review are no different from the homeowners' assertions in *Chatham*. Evidence in the record shows that Heard lives approximately 800.5 feet from the subject property, well within the 1,000-foot threshold limit. Further, he has credibly alleged a pecuniary loss to himself because he asserts that passage of CB-42-2021 would mean increased taxes for him and other Prince George's County residents. Our conclusion in this case is consistent with the observation the Supreme Court of Maryland made in *Chaney*: namely, that citizens who seek judicial review under LU § 22-407 should be able to do so, as long as they satisfy its "'non-demanding' statutory standing requirements." *Chaney*, 454 Md. at 535 (quoting *Cnty. Council of Prince George's Cnty. v. Billings*, 420 Md. 84, 97–98 (2011)). Therefore, Heard is aggrieved under LU § 22-407 and has standing to pursue judicial review in this case.

Because we determine that Heard has statutorily conferred standing to challenge CB-42-2021, we need not reach the subsidiary issues that both Heard and the District Council raise. Specifically, the District Council argues that Heard may not raise taxpayer standing as an additional basis to challenge the legislation. Heard asserts that LU § 22-407's factors "restores common law theories of standing to judicial review claims in Prince George's County." We are satisfied that Heard has standing under the statute and decline to opine about the impact the statute has on these other theories of standing.

## II.     The District Council legally enacted CB-42-2021.

Heard's first assignment of error challenges the way in which CB-42-2021 was passed and enacted. Heard argues CB-42-2021 cannot constitute a valid and enforceable local zoning law within the meaning of the RDA, given that (a) CB-42-2021 was neither presented to nor approved by the Prince George's County Executive in accordance with Section 411 of the Prince George's County Charter,[12] and thus never became a local law, or (b) CB-42-2021 is non-emergency legislation but was designed to take effect "on the date of its adoption," rather than forty-five calendar days after it became law, in violation of Section 318 of the Prince George's County Charter.[13] Heard contends that the District Council exceeded its authority and calls the bill's passage an invalid action.

---

[12] Section 411 of the Prince George's County Charter states:

Upon the enactment of any bill by the Council, with the exception of such measures made expressly exempt from the executive veto by this Charter, it shall be presented to the County Executive within ten days for their approval or disapproval. Within ten days after such presentation, they shall return any such bill to the Council with their approval endorsed thereon or with a statement, in writing, of their reasons for not approving the same. Upon approval by the County Executive, any such bill shall become law. Upon veto by the County Executive, their veto message shall be entered in the Journal of the Council, and, not later than at its next legislative session-day, the Council may reconsider the bill. If, upon reconsideration, two-thirds of the members of the full Council vote in the affirmative, the bill shall become law. Whenever the County Executive shall fail to return any such bill within ten days after the date of its presentation to them, the Clerk of the Council shall forthwith record the fact of such failure in the Journal, and such bill shall thereupon become law. In the case of budget and appropriation bills, the County Executive may disapprove or reduce individual items in such bills, except where precluded by State law. Each item or items not disapproved or reduced in a budget and appropriation bill shall become law, and each item or items disapproved or reduced in a budget and appropriation bill shall be subject to the same procedure as any other bill vetoed by the County Executive.

[13] Any law, except an emergency law, shall take effect forty-five calendar days after it becomes law, unless by a provision of the law it is to take effect at a later date, or unless it is petitioned to referendum as provided in Section 319 of this Charter.

15

The District Council, citing several appellate authorities, essentially argues that, under the RDA, zoning enactments of the District Council are not subject to the county charter. Rather, the District Council's authority to enact text amendments such as CB-42-2021 is subject to the provisions of the Zoning Ordinance, not the charter. The Council contends that, acting in accordance with its authority under the RDA, it lawfully passed and enacted the legislation.

Zoning in much of Prince George's County is governed by the RDA. In 1927, Prince George's and Montgomery Counties formed the Maryland-National Capital Park and Planning Commission (M-NCPPC):

> The General Assembly originally created the Commission by Chapter 448 of the Laws of 1927 (Chapter 448). By this extensive statute, the Commission administered certain park development, planning and zoning functions within those portions of Prince George's and Montgomery Counties adjoining the District of Columbia. The Commission was given the power to sue and be sued, issue bonds, implement land use and subdivision regulations and generally effectuate the purpose of Chapter 448, which was the "coordinated, comprehensive, adjusted, systematic and harmonious development of the (Metropolitan) District." Exclusive power over planning and zoning was vested in the Commission and the Boards of County Commissioners of the two counties.

*Prince George's Cnty. v. Md. Nat'l Cap. Park and Plan. Comm'n*, 269 Md. 202, 206 (1973).

The General Assembly passed the Maryland-Washington Regional District Act (RDA) in 1939, Chapter 714 of the Laws of 1939, separating the M-NCPPC's parks and planning functions. *Id.* In 1959, the General Assembly consolidated all of the provisions relating to the Commission by enacting Chapter 780 of the Laws of Maryland. Today,

under LU § 22-104(a),[14] the RDA authorizes the Prince George's Council to adopt, amend and administer zoning laws within the county. *See Grant*, 465 Md. at 503 ("For Prince George's County, the State Regional District Act ('RDA'), authorizes the District Council to adopt, amend and administer zoning laws within the county.") In short, the RDA "regulates planning and zoning within the Regional District, which includes most of Prince George's and Montgomery Counties." *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490, 504 (2015).

At issue in this case is the interaction of the RDA with the Prince George's County Charter. Article VII of the Charter concerns itself with zoning issues and is subdivided into fifteen sections, 701 through 715, which set out the authority and process for, among other things, approving and adopting the general plan and master plans, zoning ordinances, amendments, exceptions, as well as the procedure for hearing zoning cases and for judicial review.

The District Council relies on *Prince George's County v. Maryland National Capital Park and Planning Commission*, 269 Md. at 202, for the proposition that Article VII of the Prince George's County Charter, requiring a forty-five-day delay before the enactment of zoning legislation and for the county executive's assent to zoning enactments, has been effectively displaced by the RDA which gives all zoning authority to the District Council. In *Prince George's County v. Maryland National Capital Park and Planning*

---

[14] (a) The Montgomery County district council or the Prince George's County district council, in accordance with the requirements of this division as to the portion of the regional district located in the respective county, may:
  (1) by local law adopt and amend the text of the zoning law for that county; and
  (2) by local law adopt and amend any map accompanying the text of the zoning law for that county.

*Commission*, a dispute arose between the county and the M-NCPPC over whether the county could pass conditional zoning legislation. The circuit court addressed the controversy by issuing three declarations: (1) the M-NCPPC had standing to bring suit; (2) there was in fact a controversy ripe for resolution; and (3) the RDA was a public general law and thus subject to amendment or could be superseded by the Prince George's County Charter. *Id.* at 225.

The court's analysis of Declarations 1 and 2 do not concern us. Declaration 3, however, does. The controversy centered upon whether the District Council had the authority to pass conditional zoning legislation. In other words, whether the District Council could zone under certain restrictions. *Id.* at 220. But the county's charter prohibited conditional zoning. *Id.* The Prince George's County Attorney advised the County Executive that the County Charter, not the RDA controlled, thus setting up the controversy. "[T]he County alleges that the provisions of the Charter in regard to planning and zoning supersede or amend inconsistent provisions under Chapter 780 [the RDA]." *Id.* at 225.

Our Supreme Court resolved this dispute by looking at the provisions in Section 2 of the Express Powers Act, which states:

> Sec. 2. And be it further enacted, that in so far as the provisions of this subsection may be inconsistent with or contrary to the provisions of the Maryland-Washington Regional District Act, . . . the provisions of this sub-section shall have no application so long as such District Act is in force and effect and nothing contained herein shall be deemed or construed to affect the validity or operative effect, of said (District Act), which established City and Regional Planning in Montgomery and Prince George's Counties within the limits of the Maryland-Washington Regional District as said District is now or shall hereafter be defined by law.

The Court concluded that "the Charter, adopted pursuant to the provisions of the Express Powers Act and Article XI-A of the Constitution of Maryland, is not 'applicable' to the

provisions of Chapter 780 [the RDA]." *Id.* at 226. The Court concluded, saying, "This does not mean that the provisions of the Charter are invalid or illegal. They are effective in those portions, if any, of Prince George's County not included in the Regional District." *Id.*; *see Zimmer Development Co.*, 444 Md. at 524–26 (discussing how the RDA has "primary legislative authority" to adopt or amend zoning ordinances and zoning maps within RDA affected sections of Montgomery and Prince George's Counties); *Cnty. Council of Prince George's Cnty. v. Dutcher*, 365 Md. 399, 425 (2001).

Based on the histories of the M-NCPCC, the RDA, and the appellate authority cited, we conclude that the District Council is correct. The RDA was enacted to specifically give the district councils of Montgomery and Prince George's Counties the exclusive authority to enact zoning ordinances such as CB-42-2021. *Cnty. Council of Prince George's Cnty. v. Brandywine Enters., Inc.*, 350 Md. 339, 342 (1998) (The RDA is "the exclusive source of zoning authority in those areas of Prince George's County which it covers."). Contrary to what Heard argues, we hold that the District Council did not have to obtain the County Executive's assent before the bill was enacted under Charter Section 411, nor was the District Council required to delay adoption of the bill by forty-five days as prescribed by Charter Section 318. The RDA does require the petitions for judicial review of any final act of the District Council within thirty days, however, under LU § 407(a)(2), which no one disputes Heard did. This would be the only delaying mechanism to the ultimate enactment of a final decision of the District Council.

## III. The District Council Did Not Engage in Spot Zoning in Adopting CB-42-2021.

Heard's next assignment of error goes to the heart of why he thinks the District Council's adoption of CB-42-2021 was a "giveaway" to the Mission of Love Charities. In

19

his opinion, the legislation constitutes illegal spot zoning, which essentially occurs when an authority changes the zoning character for a small parcel of land but does not change it for the surrounding area. The District Council denies that it engaged in spot zoning to benefit the charitable organization to the detriment of Heard or his neighbors.[15]

The District Council argues, *first*, that CB-42-2021 cannot be spot zoning because the zone for the area remains residential (R-55). *Second*, it argues the bill amended the Table of Uses for R-55 zones to allow for the functioning of an eleemosynary or philanthropic entity to operate based on certain criteria, which is in keeping with the overall comprehensive development plan. Heard argues that this is all semantics because the effect of CB-42-2021 is spot zoning, citing in support *Modak-Truran v. Johnson*, 18 So.3d 206 (Miss. 2009).

We have held that "[s]pot zoning occurs when a small area in a [zone] district is placed in a different zoning classification than the surrounding property." *Tennison v. Shomette*, 38 Md. App. 1, 8 (1977). The Supreme Court of Maryland invalidated a zoning ordinance as spot zoning in *Cassel v. Mayor and City Council of Baltimore*, 196 Md. 348, 352 (1950). There, the area at issue had been zoned as a residential district. The Baltimore City Council rezoned a single lot within the residential zone into a commercial district to allow the property owner to operate a funeral home. In its analysis, the Court described spot zoning as

> the arbitrary and unreasonable devotion of a small area within a zoning district to a use which is inconsistent with the use to which the rest of the district is restricted, has appeared in many cities in America as the result of pressure put upon councilmen to pass amendments to zoning ordinances solely for the benefit of private interests. . . . It is, therefore, universally held

---

[15] We note that Heard abandoned his argument that the passage of CB-42-2021 also constituted contract zoning as his brief did not address that allegation.

20

that a "spot zoning" ordinance, which singles out a parcel of land within the limits of a use district and marks it off into a separate district for the benefit of the owner, thereby permitting a use of that parcel inconsistent with the use permitted in the rest of the district, is invalid if it is not in accordance with the comprehensive zoning plan and is merely for private gain.

*Id.* at 355–56. But the Court noted a permitted use, though different but still consistent with restrictions in the surrounding area, does not amount to spot zoning when

it does not conflict with the comprehensive plan but is in harmony with an orderly growth of a new use for property in the locality. The courts have accordingly upheld the creation of small districts within a residential district for use of grocery stores, . . . and even gasoline filling stations, for the accommodation and convenience of the residents of the residential district.

*Id.* Nonetheless, the Court concluded the City Council's rezoning of a single property constituted illegal spot zoning and invalidated the ordinance because it was "an arbitrary and unreasonable devotion of a small area to a use inconsistent with the uses to which the rest of the district [was] restricted, made for the sole benefit of the private interests of the owner and not in accordance with [the] comprehensive plan"). *Id.* at 357–58; *see also Mayor and Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 546 (2002) (quoting *Tennison,* 38 Md. App. at 8); *Hewitt v. Cnty. Comm'rs of Baltimore Cnty.*, 220 Md. 48 (1959).

The District Council's enactment of CB-42-2021 was "in the nature of" a legislative action. *MBC Realty, LLC v. Mayor and City Council of Balt.*, 192 Md. App. 218, 234 (2010) (holding that a text amendment is "in the nature of a legislative action"); *see Md. Overpak Corp. v. Mayor of Balt.*, 395 Md. 16, 35 (2006). Legislative action enjoys a strong presumption of validity; we do not substitute our policy judgments for those of the legislature, and we assume as the action's basis any reasonably conceived state of facts that would sustain it. *See Rylyns*, 372 Md. at 535, 542–43 ("Because special exceptions [and

21

conditional uses] are legislatively-created[,] . . . they enjoy the presumption of correctness[.]"); *Anderson House, LLC v. Mayor and City Council of Rockville,* 402 Md. 689, 723–24 (2008) (discussing the presumption in the context of original zoning and comprehensive rezoning). The challenger to the law or regulation "carries the heavy burden of establishing, by clear and affirmative evidence" the invalidity of the action. *Anderson House*, 402 Md. at 724.

Heard favorably cites *MBC Realty* for the proposition that even though the District Council did not rezone the Lyndon Hills School site, but rather, changed the table of uses for the residential zone (R-55), that act still constitutes spot zoning because the effect is the same. While it is true, as Heard argues, that this issue is discussed in *MBC Realty*, the opinion does not stand for the proposition that Heard claims. The crux of our holding in *MBC Realty* was that an action by the District Council, which might otherwise constitute spot zoning, is valid where it "bears a substantial relationship to the public health, safety, and welfare." 192 Md. App. at 239.

In *Cassel*, our Supreme Court clarified that spot zoning involves *rezoning* a parcel so that a zoning ordinance

> which singles out a parcel of land within the limits of a use district and marks it off into a separate district for the benefit of the owner, thereby permitting a use of that parcel inconsistent with the use permitted in the rest of the district, is invalid if it is not in accordance with the comprehensive zoning plan and is merely for private gain.

*Cassel*, 195 Md. at 355 (citations omitted). But, significantly, "a use permitted in a small area, which is not inconsistent with the use to which the larger surrounding area is restricted, although it may be different from that use, is not 'spot zoning' when it does not conflict with the comprehensive plan." *Id.*

22

As the District Council correctly points out, in this case, CB-42-2021 did not change the underlying zoning. The zoning for the entire area remained the same, only the table of permitted uses was changed within the area to allow a defunct school to be adapted for use by a charitable community organization, the Mission of Love Charities. However, even assuming that the District Council's enactment of CB-42-2021 was the functional equivalent of spot zoning, we hold that Heard failed to establish that the bill was not in accordance with the county's comprehensive zoning plan and was merely for private gain. *Cassel*, 195 Md. at 355. Indeed, as we explain next, the ordinance is consistent with the County's comprehensive plan and, the record establishes that the bill served a public purpose.

*A. CB-42-2021 was consistent with the comprehensive plan.*

In its appellate brief, the District Council maintains that changing the table of uses in CB-42-2021 does not constitute spot zoning because the adaptive reuse of the Lyndon Hills school is consistent with the county's comprehensive development plan. We agree.

In 2019, the county adopted a five-year plan, part of an overall revitalization effort known as Plan 2035.[16] The goal of Plan 2035 is to foster a sustainable living and working environment throughout the county, part of which the planners hope to achieve through focus on growth and the evolution of "local centers" and "regional transit districts." Capitol Heights, in which both the Lyndon Hills School and Mission of Love Charities are located,

---

[16] *Vision*, PGC PLAN 2035, MD, http://planpgc2035.org/135/Vision [https://perma.cc/7BCJ-KPMQ].

is designated as one of the local centers, and is served by the Addison Road Metro stop.[17]

Policies Eight and Nine of the "Land Use" component of the Plan 2035 are:

> **Policy 8**
> Strengthen and enhance existing residential areas and neighborhoods in the Plan 2035 Established Communities.
>
> **Policy 9**
> Limit the expansion of new commercial zoning outside of the Regional Transit Districts and Local Centers to encourage reinvestment and growth in designated centers and in existing commercial areas.

*Land Use*, PGC PLAN 2035, MD, http://planpgc2035.org/196/Land-Use [https://perma.cc/57YW-KCKN]. It seems to us that turning an unused school in a residential neighborhood into the location of a community service organization, while different from the operation of a school, is within keeping of the community and promotes the overall harmony and goals of the comprehensive plan.

We stress that Heard has not shown how this adaptive reuse conflicts with the overall plan. In his brief Heard complains the bill constituted spot zoning because, in his view, it is "arbitrary and unreasonable" because it conflicted with the DDOZ overlay zone for the Addison Road Approved Sector Plan. But the District Council specifically resolved that problem by not changing the zone but by amending the table of uses for the zone. Further, as Ms. Zavakos, the acting director of the County's Office of Planning, Housing and Economic Development explained to the District Council at the July 13, 2021 public hearing on the bill, CB-42-2021 was "a signal" that the District Council planned to do away with overlay zones with the adoption of a new zoning ordinance. Finally, Heard complains the bill was crafted solely for the Mission of Love Charities. Although Mission of Love

---

[17] PGC PLAN 2035, MD, http://www.planpgc2035.org/DocumentCenter/View/134/Growth-Policy-Map-Update-SVG [https://perma.cc/XHE4-6WJ8].

was named as the likely user of the subject property that factor is not dispositive for the reasons we shall discuss.

### B. CB-42-2021 served a valid public purpose.

*MBC Realty* concerned an ordinance that the Baltimore City Council enacted that had the effect of prohibiting the use of billboards within the City. At different times thereafter, the City Council passed three bills permitting billboards at public-owned stadia and arenas creating exceptions to the moratorium. Opponents of the ordnances challenged them; one avenue of attack was that the ordinances were nothing more than illegal spot zoning. Much like the District Council in this case, the City Council in *MBC Realty* did not change the zoning for the arenas affected by the ordinances allowing for billboards. Instead, the ordinance amended where billboards could be placed by enacting a conditional use of billboards for stadia and arenas within the City.

As does Heard, the opponents of the City's billboard ordinances favorably cited a Mississippi case, *Modak-Truran,* previously cited, which concerned a house located in a historic residential area of the City of Jackson. The house was surrounded by residences on three sides and a zoned commercial district on the fourth. The owners were permitted to operate the house as a "Bed and Breakfast Inn, Class B." The owners wanted to start serving meals to the general public at the Inn, in addition to serving meals to their boarders. Despite opposition from their neighbors, the Inn's owners succeeded in obtaining from the local legislative body an amendment to the language of the zoning ordinance that added "Bed and Breakfast Inn Class B with Restaurant," as a use in the residential zone and provided that the use would be permitted for any existing Class B bed and breakfast upon election, without the need to obtain a permit. "Because the [Inn] was the only Class B bed

25

and breakfast in the city, this amendment effectively exempted [it] from having to obtain a new use permit in order to operate a restaurant." *Id.* at 208.

The Inn's neighbors challenged the amendment, arguing it "would effectively rezone the Inn from residential to commercial," without its meeting the requirements for rezoning, thus constituting illegal "spot zoning." *Id.* at 209. The Supreme Court of Mississippi agreed. It held that the local legislature's act of amending its zoning ordinance to allow the Inn to engage in a commercial use permitted in a commercial zone but not in a residential zone was tantamount to reclassifying the Inn to the commercial zone. Echoing the same principles that underlie piecemeal zoning, the Court observed:

> There can be no dispute that the amendment was designed to favor the Inn, and such preferential treatment constitutes illegal spot zoning because the City has not demonstrated "substantial evidence of change in the neighborhood in order to justify the rezoning of a small tract as an amendment in keeping with the comprehensive plan."

*Id.* at 209–10 (quoting 2 E.C. Yokley *Zoning Law and Practice* § 13–4 (4th ed. 2003)).

In *MBC Realty*, we held that *Modak-Truran* was distinguishable from the City's billboard case, however. We noted in *Modak-Truran* other zones existed—primarily commercial zones—that permitted the Inn owners to use their property as a restaurant. The Jackson zoning ordinance amendment took only the Inn's residentially zoned property and allowed it to operate a restaurant as if it were zoned commercial, even though it remained zoned residential.

But in the case of the City, we concluded the zoning character did not change. Certain venues could apply for exceptions to the moratorium. Consequently, such an ordinance was permissible and did not constitute spot zoning. Our rationale was

> there never were, and still are not, any zoning districts in Baltimore City in which new billboards were (are) permitted uses. The Billboard Moratorium

26

removed new billboards as conditional uses in the districts that had allowed them. As the City Council had done for bus shelters, one year after the Billboard Moratorium was adopted, it made an exception to the City-wide ban, this time by enacting a conditional use for publicly-owned stadia or arenas in the B–5 district. To take advantage of the exception, such a property would have to satisfy the conditional use criteria we have discussed above. Thus, the local legislative body in this case was not treating the Arena property as if its zoning classification had been changed; it was adopting a zoning vehicle for the owner of the property to use to seek to obtain an exception from the Billboard Moratorium.

*Id.* at 241. We concluded that the facts in *Modak-Truran* and the billboard exception ordinances were simply not the same. Perhaps more importantly, *MBC Realty* reiterated that spot zoning is "not illegal *per se*:"

> It only is illegal if it is an arbitrary and unreasonable devotion of the small area at issue to a use that is inconsistent with the uses to which the remainder of the district is restricted and is done for the sole benefit of the private interests of the owner. If the zoning of the small parcel is in accordance and harmony with the comprehensive plan and is done for the public good, and thus bears a substantial relationship to the public health, safety, and welfare, it is valid.

192 Md. App. at 239 (citing *Rylyns*, 372 Md. at 546) (cleaned up).

Even if we assume the District Council's amendment of the table of uses to allow the functioning of an eleemosynary in a residential area, is spot zoning by another name, we determine the critical difference is that while the Inn in *Modak-Truran* operated solely for its own gain, the Mission of Love would be operating a "philanthropic or non-profit organization" for the benefit the of the citizens of the neighborhood and the county at-large. In this case, CB-42-2021 would not constitute spot zoning because the overall effect of the legislation would yield a public benefit, not a private one. *See Rylyns*, 372 Md. at 546; *Tennison*, 38 Md. App. at 8.

27

We are further encouraged in our view that CB-42-2021 served a valid public purpose after reading the majority's reasoning in *Prince George's County Council v. Concerned Citizens of Prince George's County*, 485 Md. 150 (2023). Although our Supreme Court analyzed the requirement of uniformity in *Concerned Citizens*, the Court's reasoning may be applied to the analogous issue of spot zoning Heard raises here. Citing *Cassell* and *Hewitt*, the Court noted, "Spot zoning cases, which typically involve uniformity or uniformity-like challenges to piecemeal rezonings, are also instructive." *Id.* at 180–81. The Court saw the parallels between uniformity and spot zoning stating that "singling out" and "uniformity" are allied concepts to spot zoning. *Id.* at 180 n.18 (footnote and accompanying text).

### 1. Background

In *Concerned Citizens*, a group of Prince George's County citizens filed a petition for judicial review of a District Council bill amending a zoning ordinance's table of uses to exempt Freeway Airport, an accident-plagued small private airport, from housing and development density restrictions generally applicable to properties in residential-agricultural (R-A) zone. Instead of spot zoning, the citizens group challenged the ordinance because it allegedly violated LU § 22-201(b)(2)(i), which mandates that zoning laws "be uniform for each class or kind of development throughout a district or zone." *Id.* at 161–62.

In *Concerned Citizens*, as is the case here, the District Council proposed bill CB-17, which amended the table of uses in affected R-A zone specifically to permit

28

"Townhouse and One-family detached dwelling uses in the R-A (Residential Agricultural) Zones of Prince George's County, under certain circumstances." Even though the bill was facially neutral in its application, the Planning Board opposed the bill, as was the case here. Specifically, the Planning Board argued that an R-A zone was designed for large-lot one-family detached residential subdivisions, not townhouses. Further, without the bill's requirement that a property be a "former airport," the Planning Board noted that 262 properties in the county would meet the bill's requirements. With the "airport" language, only Freeway Airport met those requirements. The County's Office of Law concurred, stating the proposed bill could "be subject to challenge as it appears to be drafted for a specific parcel." The Planning Board and the Office of Law maintained the same objections after two amendments to the bill were proposed. But neither the Board nor the Office of Law noted a violation of the uniformity requirement. *Id.* at 166. Both the Board and the Officer of Law opposed two subsequent versions of the bill for the reasons stated. *Id.* at 166, 169–70. But after a public hearing and an amendment, the District Council approved the third version of CB-17 "permitting townhouses and single-family detached homes in the R-A Zone at up to 4.5 dwelling units per acre" consistent with certain enumerated conditions. *Id.* at 171–72. Concerned Citizens then sought judicial review in the circuit court, citing among other issues, the uniformity requirement. The circuit court affirmed the District Council.

Concerned Citizens sought further judicial review in this Court. In a reported opinion, we sided with Concerned Citizens, holding that CB-17 violated the uniformity requirement. *In re Concerned Citizens of Prince George's Cnty. Dist. 4*, 255 Md. App. 106 (2022). We concluded that CB-17 was "tailor-made for Freeway Airport" and that the

29

record did not show "any public purpose for creation of this special high-density area within an R-A zone[.]" *Id.* at 124.

The Supreme Court of Maryland granted the District Council's petition for certiorari to resolve the question of whether "CB-17 violates uniformity because the Council narrowly tailored it to single out the Freeway airport as the only qualifying property." *Id.* at 179–80. The Court ultimately held that the legislation did not violate uniformity because (1) it was adopted to further a valid public purpose and (2) did not discriminate against similarly situated properties. *Id.* at 162. We apply the same standard here to support our analysis of whether CB-42-2021 served a valid public purpose.

2. Public Purpose

Explaining that "[a] valid public purpose promotes uniformity by not favoring one party over another," and, citing *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 720 (1977) and *Anderson House*, 402 Md. at 719, the *Concerned Citizens* Court held that the regulation at issue served a valid public purpose:

> Here, CB-17 furthers a public purpose by incentivizing the redevelopment of land currently used for a nonconforming and dangerous airport. Eliminating the risk of plane crashes, particularly in a residential area, without question furthers an interest in public safety, and Concerned Citizens has not argued otherwise. Moreover, some constituents and at least one local association supported CB-17 because they expected townhouse development would benefit the local economy.

*Id.* at 150, 181–83.

The Supreme Court noted that zoning legislation has been held invalid when a private purpose, rather than a valid public purpose, is served. *Id.* at 182 (citing *Cassel*, 195 Md. at 358; *Hewitt v. Cnty. Comm'r of Balt. Cnty.*, 220 Md. 48, 62–63 (1959) (zoning map amendment reclassifying two properties in a large residential area to business zoning held

30

illegal when the only evidence of a public benefit was deemed too vague)). However, a mere showing that zoning legislation had a "'site-specific' intent or effect," without more, will not sustain a uniformity violation on grounds of an impermissible private purpose. *Id.* at 190 ("That a regulation affects only one or a few properties, though relevant to our uniformity analysis, is not dispositive.").

In support of that premise, the Supreme Court discussed our holding in *MBC Realty,* where, as previously discussed in this opinion, we sustained the City Council of Baltimore's enactment of a text amendment allowing new billboards in a manner that would render only the First Mariner Arena eligible, holding that we "[do] not impose a [] knowledge limitation upon the legislative act." *Concerned Citizens*, 485 Md. at 192 (citing *MBC Realty*, 192 Md. App. at 236). We thereby sustained an amendment "solicited by a private interest and targeting one property both in intent and effect." *Id.*

Additionally, the Supreme Court dismissed Concerned Citizens' argument that CB-17 evinced an illicit relationship between the Council and the airport, noting that nothing in the record supported that view. *Id.* at 186–87 ("The record provides no reason to think the Council would not have passed CB-17 if some other party owned or intended to develop the airport.").

Here, CB-42-2021's sponsors noted in the original and subsequent drafts of the bill that the purpose of the legislation was to permit the long-abandoned and decommissioned Lyndon Hill School to "be adaptively reused primarily by an eleemosynary, or philanthropic institution, providing social services to the community." Then-Councilman Streeter, the bill's primary sponsor, addressed the public benefit of the bill:

> MR. STREETER: Yeah, thank you, Mr. Chair; and thank all my colleagues for a willingness to sign on to this piece of legislation as it is very important

31

for Mission of Love who has been a pillar in our community and provided great service to some of our most vulnerable citizens.

The Committee Report on CB-42-2021, dated July 1, 2021, echoed the Council member's comments. And Arthur Horne, attorney for the Mission of Love testified at the public hearing:

> For the record, Arthur Horne, again, here on behalf of the Mission of Love. As you all know, the Mission of Love is operating, and has been operating, in this area for a long time. They now need to relocate their offices and what this bill does is simply allows them to move about 150 yards from where they are now across the street into a, an old, abandoned school building.

To be sure, the record could be more substantive in describing exactly what services Mission of Love Charities provides to the community, but there does not seem to be any dispute that those services have been provided, are valued, and relied on by the community. The record is clear enough for us to conclude that even if CB-42-2021 was crafted specifically for Mission of Love Charities, it does not constitute spot zoning because the legislation provides an overall benefit to the community rather than a financial opportunity for the Mission of Love Charities. Further, this purpose seems consistent with the overall plan of developing the community in an orderly and community-spirited way. For these reasons, the ordinance would not constitute spot zoning. *MBC Realty*, 192 Md. App. at 239. *Rylyns*, 372 Md. at 546; *Tennison*, 38 Md. App. at 8.

While we understand that one of Heard's concerns is that the District Council simply gave publicly owned land to a favored constituent, as was also alleged in *Concerned Citizens*, our review of the record yields no evidence from which we can draw the same

32

conclusion.[18] Far from being a "giveaway," which seems to connote an action solely to benefit the recipient, here, though CB-42-2021 was clearly intended for Mission of Love Charities, the testimony from the public hearing of the testimony in favor of the bill (which no one opposed on the record), would provide a valid public benefit for the community. Though *Concerned Citizens* portrays the Council's "site-specific" efforts as alarming, such amendments are not unusual and are often initiated by private interests. "That a legislature may contemplate a specific property does not prove the absence of a public purpose, or arbitrary or invidious discrimination; we do not require legislatures to conceive of legislation "as an abstraction" without any actual properties in mind." *Concerned Citizens*, 485 Md. at 150 (citing *MBC Realty*, 192 Md. App. at 236).

Given the undisputed evidence that the District Council acted to serve a public purpose in enacting CB-42-2021, and the lack of countervailing evidence of any impermissible private purpose, our application of uniformity analysis supports the conclusion above that CB-42-2021 served a public purpose sufficiently to survive Heard's claim of illegal spot zoning.

3.  Similarly Situated Properties

The majority in *Concerned Citizens* held that "[a] finding that a regulation furthers a public purpose does not mark the end of our uniformity analysis"; we must also consider "whether it discriminates between properties in a reasonable manner." *Concerned Citizens*, 485 Md. at 193 (cleaned up). Discrimination between properties does not necessarily

---

[18] Indeed, we previously noted that Heard has not pursued his argument that CB-42-2021 constitutes contract zoning, meaning zoning resulting from an illicit agreement between the parties, *see Rylyns*, 372 Md. at 547, despite having raised that objection before the circuit court.

violate uniformity, but it will do so where the regulation singles out a property for different treatment from others that are "similarly situated"; two properties are similarly situated "when there is no reasonable basis to treat them differently." *Id.* at 194.

This factor is relevant in a spot zoning context as well. Discrimination between similar properties is inherent in spot zoning; even where a public purpose is served by spot zoning, it may be found impermissible where the spot zoning allows use inconsistent with the treatment of similar properties. *See Cassel*, 196 Md. at 357–58 (use "inconsistent with the uses to which the rest of the district [was] restricted" constitutes spot zoning).

In *Concerned Citizens*, the plaintiff failed to set forth evidence that the District Council discriminated against *similarly situated* property:

> Here, CB-17 discriminates between properties, but Concerned Citizens has not shown that CB-17 discriminates between similarly situated properties. Concerned Citizens has not identified any actual, or even hypothetical, properties similarly situated to the Freeway airport that the qualifying criteria of CB-17 excluded from higher-density development opportunities.

*Concerned Citizens*, 485 Md. at 197.

As in *Concerned Citizens*, in this case, there is simply nothing in the record from which we might determine that the District Council improperly discriminated against similarly situated properties. Heard did not present that argument on judicial review before the circuit court,[19] and we find nothing in the record to suggest that this issue came before the District Council or circuit court.

---

[19] While we note that Heard included some discussion of CB-42-2021's impact upon similarly situated *taxpayers* in support of his standing argument, both before the circuit court and in his opening brief in this court, he made no mention of similarly situated *properties*.

Discrimination therefore bears no weight in our determination of whether CB-42-2021 constituted illegal spot zoning. However, we include discussion of this factor to note that, where evidence appears in the record that tends to suggest that a regulation unreasonably discriminates against similarly situated properties, it would be a proper consideration in determining whether alleged spot zoning served a valid public purpose.

## CONCLUSION

Heard has standing to contest the Prince George's County District Council's passage of CB-42-2021. We hold that the legislation was properly enacted pursuant to the RDA, and we find nothing in the record to suggest that its enactment constituted illegal spot zoning. Therefore, we affirm the circuit court, albeit on different grounds.

> **JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.**